[Cite as *In re J.W.*, 2012-Ohio-3528.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

**IN THE MATTER OF:**

    **J.W.,**

**DEPENDENT CHILD.**

**[JOHN WARD - APPELLANT].**
**[STEPHANIE WARD - APPELLANT].**

**CASE NO.  13-12-10**

**O P I N I O N**

Appeal from Seneca County Common Pleas Court
Juvenile Division
Trial Court No. 20750071

**Judgment Affirmed**

Date of Decision:  August 6, 2012

**APPEARANCES:**

    *Gene P. Murray*  for Appellant, Stephanie Ward

    *David K. Goodin*  for Appellant, John E. Ward

    *Lisa A. Miller,*  Guardian Ad Litem

    *Victor H. Perez*  for Appellee, Seneca Co. DJFS

**PRESTON, J.**

{¶1} Parents-appellants, John and Stephanie Ward, appeal the Seneca County Court of Common Pleas Juvenile Division's decision granting the Seneca County Department of Job and Family Services' ("the agency") motion for permanent custody of their minor child, J.W. John and Stephanie argue this Court should reverse the trial court's decision because it is against the manifest weight of the evidence, the agency did not make a good faith effort to implement a reunification plan, and the trial court had not included a provision in its temporary custody order prohibiting Stephanie and J.W. from having contact with Stephanie's boyfriend, but used that relationship as a reason to grant the agency permanent custody of the child. For the reasons that follow, we affirm.

{¶2} This case stems from an instance of domestic violence that occurred in 2007. (Sept. 19, 2011 Tr. at 57); (Sept. 21, 2011 Tr. at 636-637). John and Stephanie had an argument that became violent when Stephanie attempted to leave the home with their child, J.W. (Sept. 21, 2011 Tr. at 636-637, 695-695). John choked Stephanie, grabbed J.W. from her arms, and threw her against the television. (*Id.*). Following that incident, John was charged and convicted of domestic violence. (Ex. K); (Sept. 21, 2011 Tr. at 636).

{¶3} On September 6, 2007, Stephanie filed an application for a civil protection order ("CPO") against John. (Ex. Q). Stephanie claimed she feared

John, thought he had mental problems, knew he abused drugs, and knew that he had previously shot himself three times. (*Id*.).

{¶4} On September 13, 2007, a caseworker, Erica Cleveland, visited John's home after the CPO went into effect. (Nov. 30, 2011 Tr. at 1186). Cleveland discovered that Stephanie was again living with John. (*Id*.). John and Stephanie asserted that Stephanie was going to dismiss the CPO because John was getting help. (*Id*. at 1187). On that same day, the agency filed a complaint alleging J.W. was neglected and dependent. (Joint Ex. 1). J.W. was removed from the home and placed in the agency's temporary custody. (*Id*.).

{¶5} On September 21, 2007, the Seneca County Court of Common Pleas granted Stephanie's request to dismiss the CPO against John. (Ex. R).

{¶6} On October 3, 2007, the juvenile court adjudicated J.W. as dependent pursuant to R.C. 2151.04 based on his parents' admissions. (Joint Ex. 1).

{¶7} On November 3, 2007, the juvenile court approved the case plan, which required, among other things, that John participate in anger management classes and that Stephanie participate in counseling to address her domestic violence issues, including no longer having domestic violence disturbances. (Doc. No. 20).

{¶8} On December 5, 2007, the juvenile court entered an order eliminating both parents' visitation and ordering them not to have contact with Cleveland.

(Doc. No. 29). The juvenile court's order was a result of a threatening voicemail Cleveland received. (Nov. 30, 2011 Tr. at 1190-1192). Cleveland identified the voice in the voicemail as John's. (*Id.*). The agency subsequently replaced Cleveland with caseworker Jacob Rishty. (*Id.* at 1044-1045).

{¶9} On April 21, 2008, a Port Clinton officer responded to Stephanie's domestic violence call. (Ex. A). Stephanie and her boyfriend, David Myers, were injured. (*Id.*). The officer arrested Stephanie and Myers and charged them each with domestic violence. (*Id.*).

{¶10} On September 3, 2008, the juvenile court issued its judgment entry altering the parents' visitations. (Doc. No. 55). The order granted John unsupervised visitation with J.W. and overnight weekend visits. (*Id.*). The order granted Stephanie visits with J.W., supervised by Yolanda Dillinger, and prohibited Stephanie from having Myers present during her visits with J.W. (*Id.*).

{¶11} On August 12, 2008, the juvenile court moved J.W. from a foster home to a kinship placement with Barb Newland. (Doc. No. 59). On November 20, 2008, the juvenile court issued a judgment entry to gradually transition J.W. from temporary custody with Newland to temporary custody with John. (Doc. Nos. 71-72).

{¶12} On November 25, 2008, the juvenile court granted John temporary custody of J.W. after Newland was injured and unable to continue caring for him.

(Doc. No. 73). During a home visit, Rishty discovered John had a bottle of mixed pills combined with small pieces of marijuana. (Nov. 30, 2011 Tr. at 1065). After consulting with law enforcement, the agency filed a motion for temporary custody of J.W. (Doc. No. 96).

{¶13} In December 2009, John was in a psychiatric hospital for roughly two weeks after he was discovered hallucinating on the side of the road. (Nov. 30, 2011 Tr. at 1067). The hospital's discharge orders instructed him to complete a partial hospitalization program, which was added to the case plan. (*Id*. at 1067-1068); (John's Ex. 1).

{¶14} On February 9, 2009, Tiffin police responded to a call that Stephanie was in the middle of an intersection crying and stating that Myers had assaulted her. (Ex. D). Stephanie told police that Myers had grabbed her by the neck and hit her in the face. (*Id*.).

{¶15} On June 22, 2009, the juvenile court granted the agency temporary custody of J.W. (Doc. No. 97).

{¶16} On July 15, 2009, Tiffin police responded to a call at Stephanie's residence. (Ex. H). When they arrived, the officers could hear a woman yelling for help from inside the house. (*Id*.). Myers opened the door to the residence, and the officers could see Stephanie kneeling on the floor, wearing only her panties. (*Id*). She was crying and yelling for the officers to help her. (*Id*.). Stephanie's

face was beginning to swell and she had blood around her mouth. (*Id*.). Stephanie told the officers Myers had repeatedly punched her. (*Id*.). Myers was subsequently charged with domestic violence and sentenced to ten months imprisonment. (Sept. 19, 2011 Tr. at 221).

{¶17} On November 18, 2009, officers again responded to a domestic violence call involving Stephanie and Myers. (Ex. U). Both Stephanie and Myers were injured and charged with domestic violence. (*Id*.). This incident resulted in a probation violation for Myers. (Ex. M).

{¶18} On January 13, 2010, the agency filed a motion for permanent custody of J.W. (Doc. No. 125). On June 16, 2010, the guardian ad litem, Lisa Miller, also filed a motion to commit J.W. to the agency's permanent custody. (Doc. No. 151). On July 1, 2010, Stephanie filed a motion for temporary custody of J.W. (Doc. No. 161).

{¶19} On July 29, 2010, John was indicted on two counts of felony aggravated drug trafficking. (Ex. MM). John was convicted on both counts following a jury trial and on April 13, 2011, was sentenced to 30 months imprisonment. (Ex. F).

{¶20} The juvenile court held hearings on Stephanie's motion for temporary custody on July 16 and 26, 2010, and January 5, February 11, and February 15, 2011. (Doc. No. 196). On March 1, 2011, the juvenile court granted

Stephanie temporary custody of J.W. (*Id.*). The temporary custody order required Stephanie "to follow all recommendations of the caseworker." (*Id.*).

**{¶21}** On April 15, 2011, the juvenile court reviewed Stephanie's temporary custody of J.W. (Doc. No. 204). John raised concerns that he believed Stephanie may have resumed her relationship with Myers after Myers was released from prison. (*Id.*). The juvenile court reiterated that J.W. was not to have any contact with Myers. (*Id.*). Stephanie retained temporary custody of J.W. (*Id.*).

**{¶22}** On May 11, 2011, the agency filed a motion requesting the juvenile court to issue an order for Stephanie to show cause why she should not be held in contempt for violating the juvenile court's orders. (Doc. No. 208). The agency alleged that Stephanie had taken J.W. to Myers' house in violation of the juvenile court's order for J.W. not to have any contact with Myers. (*Id.*). The juvenile court entered the requested order on that same day. (Doc. No. 210).

**{¶23}** On May 23, 2011, Miller, the guardian ad litem, filed a motion to terminate Stephanie's temporary custody of J.W. (Doc. No. 212). On May 31, 2011, the juvenile court placed J.W. in the agency's temporary custody. (Doc. No. 213).

**{¶24}** On June 27, 2011, the agency filed a motion for permanent custody of J.W. (Doc. No. 221). The agency alleged Stephanie should not be reunified

with J.W. because of her relationship with Myers. (*Id.*). The agency claimed Stephanie and Myers had a violent relationship that created an unsafe environment for J.W. (*Id.*).

{¶25} On August 8, 2011, Seneca County law enforcement responded to a 911 hang up call from Myers' residence. (Nov. 29, 2011 Tr. at 800-802). When the officer arrived, Stephanie told him she did not mean to call law enforcement. (*Id.* at 804-805); (Ex. CC).

{¶26} On August 15, 2011, Stephanie called Crawford County law enforcement because Myers had hit her and left her on the side of the road. (Ex. DD).

{¶27} The juvenile court held a hearing on the agency's permanent custody motion on September 19 through 21, 2011. (Doc. No. 267). Due to time constraints, the juvenile court scheduled the remainder of the hearing for November 2011. (*Id*).

{¶28} On October 27, 2011, Seneca County law enforcement responded to another call at Myers' residence. (Ex. KK); (Ex. LL). Upon arrival, the officer found Stephanie in Myers' trailer with her nose swollen and bleeding. (*Id.*); (*Id.*). Stephanie told the officer Myers had shoved her head into the refrigerator and knocked her unconscious. (*Id.*); (*Id.*). Stephanie stated that she woke up spitting blood and Myers had left. (*Id.*); (*Id.*). Stephanie's adult daughter, Gabby, was

present at the time of the incident. (*Id.*); (*Id.*). Myers was charged with domestic violence and Stephanie filed a petition for a CPO against Myers. (Ex. HH). The Seneca County Court of Common Pleas dismissed her CPO petition when she failed to attend the hearing on November 4, 2011. (Ex. II).

{¶29} On November 29 and 30, 2011, the juvenile court heard the remaining testimony and evidence regarding the agency's motion for permanent custody of J.W. (Doc. No. 267). On January 12, 2012, the juvenile court granted the agency's motion and placed J.W. in the agency's permanent custody. (*Id.*).

{¶30} On January 31, 2012, John filed a notice of appeal. (Doc. No. 272). On February 13, 2012, Stephanie also filed a notice of appeal.[1] (Doc. No. 279). John and Stephanie each raise two assignments of error for our review. For the purposes of our discussion, we will address the assignments of error together where appropriate.

### Stephanie's Assignment of Error No. I

**The trial court erred by granting the permanent custody of the minor, [J.W.], to the movant Seneca County Department of Job and Family Services, on grounds that the trial court's granting of same was against the manifest weight of the evidence; and as such, was not in the best interests of the minor child, who professed in his in camera interview with the court, that his desire, more than anything in the world, was to live with his mother, the appellant Stephanie Ward, who provided her child with nurturing and bonding parental love, and with appropriate food, clothing and shelter, and about which the Seneca**

---

[1] The end of the 30 day time period for filing a notice of appeal fell on Saturday, February 11, 2012. Under App.R. 14, Stephanie was permitted to file her notice of appeal on Monday, February 13, 2012.

**Department of Job and Family Services was unable to provide clear and convincing evidence to the contrary, thereby resulting in the aforementioned reversible error by the trial court.**

**John's Assignment of Error No. I**

**The trial court's award of permanent custody of [J.W.] to Seneca County Department of Job and Family Services ("Agency") because it was in the best interest of the child was not supported by clear and convincing evidence and was contrary to law.**

{¶31} We will address Stephanie and John's first assignments of error together since they involve the same issues of fact and law. In her first assignment or error, Stephanie argues the juvenile court's decision granting the agency permanent custody of J.W. is against the manifest weight of the evidence because it is not in J.W.'s best interest and contrary to J.W.'s expressed desire to live with his mother. In his first assignment of error, John argues the juvenile court's decision is not supported by clear and convincing evidence and is contrary to law because it is not in J.W.'s best interest.

{¶32} As an initial matter, we note that John does not argue the juvenile court should have granted him custody of J.W., but rather, that the juvenile court erred by failing to find that the agency did not meet its burden of proof and that the agency should continue to work towards reunifying J.W. with Stephanie. Consequently, John's arguments address errors concerning Stephanie, another appellant in this case. Generally, an appealing party may not complain of an error

committed against a non-appealing party. *In re Mourey*, 4th Dist. No. 02CA48, 2003-Ohio-1870, ¶ 20. This Court has previously applied this rule in permanent custody cases, determining that an appealing parent does not have standing to allege errors committed against another appealing parent. *In the Matter of J.T.*, 3d Dist. Case Nos. 13-07-31, 13-07-32, 2008-Ohio-1650, ¶ 16. John thus does not have standing to raise errors on Stephanie's behalf. Nevertheless, we will briefly address John's arguments.

{¶33} The right to raise one's own child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). Parents have a "fundamental liberty interest" in the care, custody, and management of their children that is protected by law. *Id*. However, parental rights and interests in their children are not absolute. *In the Matter of Thomas*, 3d Dist. No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 3d Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶ 6. "When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In the Matter of C.E.*, 3d Dist. Nos. 5-09-02, 5-09-03, 2009-Ohio-6027, ¶ 14.

{¶34} According to R.C. 2151.414(B)(1), a court may grant permanent custody of a child to the agency that filed the motion if the court determines by

clear and convincing evidence that it is in the child's best interest and that the "child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *." When determining whether granting permanent custody to the agency is in the best interest of the child, the court must consider all of the relevant factors listed in R.C. 2151.414(D)(1), including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

-12-

(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

Additionally, R.C. 2151.414(E) requires the court to consider all of the relevant evidence when determining whether a child can be placed with either parent within a reasonable time.  In pertinent part, the court must find that the child cannot or should not be placed with either parent if it determines by clear and convincing evidence that:

(1)   Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(5)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate home for the child.

\* \* \*

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

**{¶35}** Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954), citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915).  The Supreme Court of Ohio has defined clear and convincing evidence as an intermediate standard, "being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Id*.  This Court must "determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof." *In the Matter of Lane*, 3d

Dist. Nos. 9-03-61, 9-03-62, 2004-Ohio-2798, ¶ 27. This Court will not overturn the juvenile court's judgment as being against the manifest weight of the evidence "if the record contains competent, credible evidence by which the court could have formed a belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Baby Boy W.*, 3d Dist. No. 5-10-39, 2011-Ohio-2337, ¶ 20, citing *In re S.*, 102 Ohio App.3d 338, 344-345 (6th Dist.1995).

{¶36} In the present case, neither party contests that J.W. has been in the agency's temporary custody for at least 12 of a consecutive 22 month period. Consequently, the sole issue before this Court is whether granting the agency's motion for permanent custody was in J.W.'s best interest.

{¶37} During the permanent custody hearing, numerous officers testified regarding domestic violence incidences involving Stephanie and Myers. Officer Corbin Carpenter testified that he responded to a domestic violence call on April 21, 2008. (Sept. 19, 2011 Tr. at 22). Stephanie told Officer Carpenter that Myers "flew into a fit of rage and, uhm, started to fight over the keys, hit her, choked her, threw her to the ground and she fought back." (*Id*. at 28-29).

{¶38} Officer James Chandler testified that he responded to a domestic violence call on February 9, 2009. (*Id*. at 35). Stephanie "was highly upset, said

she was assaulted by her boyfriend, David Myers. She said that she was punched in the face several times." (*Id*. at 41).

{¶39} Officer Mark Marquis testified regarding responding to a domestic violence call on July 15, 2009. (*Id*. at 210-202). Officer Marquis testified that Stephanie was wearing only panties when he arrived, was very disheveled, and appeared to have been crying for quite some time. (*Id*. at 203). Officer Marquis testified that Stephanie had obvious facial injuries and stated that Myers had repeatedly punched her in the face. (*Id*. at 203). According to Officer Marquis, "[s]he indicated that they had been at a neighbor's and when they returned home, it was like a light switch had flipped and he began yelling at her and calling her names and then assaulting her." (*Id*. at 203-204). Officer Marquis testified that Myers entered into a plea agreement and was sentenced to ten months imprisonment as a result of the incident. (*Id*. at 221).

{¶40} Detective Jason Kiddey testified about responding to an incident on November 18, 2009. (Nov. 29, 2011 Tr. at 734). Detective Kiddey testified that Stephanie and Myers were arguing, and they both had visible injuries. (*Id*. at 735). Detective Kiddey testified that they were both charged with domestic violence but pleaded guilty to lesser offenses. (*Id*. at 739-741).

{¶41} Lieutenant Brian Hescht testified that he responded to a 911 hang-up call on August 8, 2011. (*Id*. at 800-802). When Lieutenant Hescht arrived, he

observed Stephanie and Myers arguing. (*Id*. at 803). Lieutenant Hescht testified that Stephanie informed him that she had not intended to call 911. (*Id*. at 804-805).

**{¶42}** Sergeant William Herrig testified that he responded to a domestic violence call on October 27, 2011. (*Id*. at 916). Sergeant Herrig testified that he observed Stephanie with a very swollen nose and blood running down her face. (*Id*. at 920). Sergeant Herrig testified that Stephanie indicated that, "her and David Myers had gotten into an argument and the argument escalated into a situation where he grabbed her and her purse and she was thrown against the refrigerator and sustained the injury to her nose." (*Id*.).

**{¶43}** Lisa Miller, the guardian ad litem, recommended that the juvenile court grant the agency permanent custody of J.W. (Sept. 19, 2011 Tr. at 60). Miller testified that the case had been going on for four years at the time of the permanent custody hearing, and that J.W. "has nearly been in foster care longer than he was ever in his original family. He wasn't potty trained and couldn't feed himself with utensils at five years old." (*Id*. at 99). Miller testified that before Myers went to prison for his domestic violence conviction, Stephanie was living with Myers and not moving forward on the case plan. (*Id*. at 67-69). According to Miller, after Myers went to prison, Stephanie began visiting J.W. more regularly. (*Id*. at 68-69). Miller testified that throughout this case, Stephanie

repeatedly violated instructions, stating that she "will only divulge to you what she wants you to hear, what she thinks you want to hear. And she will tell you to the face ad nauseam that she's dedicated. She will cry tears and tell you she's gonna do everything, and then you'll find out she's doing all kinds of things she's not supposed to do." (*Id*. at 65). Miller testified that Stephanie repeatedly smoked in the home in violation of court orders and despite concerns about J.W.'s health. (*Id*. at 60). Miller further testified that Stephanie permitted J.W. to play video games outside of the parameters provided in court orders, which resulted in behavioral problems. (*Id*. at 121). Miller testified that Stephanie sent her adult daughter, Gabby, to pick J.W. up after school although Stephanie was supposed to be responsible for J.W.'s care during the day. (*Id*. at 60-61). According to Miller, J.W. had not seen his mother in three days at that point. (*Id*.). Miller testified that she and others involved in the case had a discussion with Stephanie informing her that J.W. would be removed if she and J.W. had contact with Myers and that Stephanie had stated she would not have contact with Myers. (*Id*. at 64). Miller testified that she later discovered that J.W. spent the night at Myers' home while in Stephanie's temporary custody and that J.W. did not like spending time with Myers because Myers was "mean" to him and his mother. (*Id*. at 122-123). Miller testified that J.W. loved his mother and would like to be with her, but that he does not feel safe in the home and does not want to live there if Myers is present. (*Id*.

at 73-75). Miller further testified that J.W. missed his older siblings and grandmother, but has a good relationship with his foster family. (*Id*. at 78-79). According to Miller, kinship placement is not an option for J.W. because none of his family members are able to take him, so the only stable, permanent option is through permanent custody with the agency. (*Id.* at 80-81). Miller testified that Stephanie has consistently had violent relationships, from John, to a man she met on the internet who threatened her, to Myers. (*Id*. at 81-82). Miller testified that J.W. has developmental delays including issues with his fine motor skills, which means "currently he's working on tying his shoes at 9-years old." (*Id*. at 118). Miller testified that J.W. has never been on grade level academically, but that he has been mainstreamed into a regular classroom while in his current foster home. (*Id*. at 118-120).

{¶44} Cindy Weber, an intervention specialist at Specialized Alternatives for Family and Youth (SAFY), testified regarding her interactions with Stephanie and J.W. (*Id*. at 135-136). Weber testified that she developed a treatment plan according to J.W.'s symptoms, to determine what he needed. (*Id*. at 140). She stated that she was teaching Stephanie "some parenting skills and strategies, developing the consistency to parent effectively." (*Id*. at 143). Weber testified that initially they focused on J.W., but as time went on "we got into more of a healthy relationship and what it looks like, because it related directly to [J.W.'s]

well-being." (*Id*. at 146). Weber testified that it was important for Stephanie to be in a healthy relationship "that wasn't detrimental to [J.W.], that he wasn't observing inappropriate behaviors or, uhm, violence." (*Id*. at 146). Weber testified that violent relationships are detrimental to children because they will learn from them, think it is acceptable, and potentially copy the behaviors as adults. (*Id*. at 148). Weber testified that there is also the danger that the child will get in the middle of a violent altercation in an attempt to stop it or protect the parent. (*Id*. at 148). Weber testified that she referred Stephanie to additional domestic violence agencies in August 2010, but she does not believe Stephanie ever followed up with those agencies. (*Id*. at 162-165).

{¶45} Melvin Proctor, a therapist with SAFY, testified regarding his treatment of J.W. (Sept. 20, 2011 Tr. at 245-248). Proctor testified that J.W. is sad and angry about being separated from his mother but is beginning to accept the separation. (*Id*. at 268, 281). Proctor testified that J.W. was nine years old at the time of the permanent custody hearing and was cognitively delayed but is making progress. (*Id*. at 278-279). Proctor testified that he did not know the reason for the delays because there were a variety of potential factors, but trauma and an unstable home environment could have contributed to J.W.'s issues. (*Id*. at 285-287).

{¶46} Myers testified about his relationship with Stephanie and contact with J.W. Myers testified that he had at least two domestic violence convictions, one that resulted in prison time, before his conviction for domestic violence against Stephanie. (*Id*. at 306-307). Myers' parental rights to his children were revoked while he was incarcerated. (*Id*. at 300). Myers testified that he developed a relationship with Stephanie when her husband began abusing her, "locking her into the basement. And, uhm-uhm, I believe maybe he might have killed her cats and she felt that her life was at danger." (*Id*. at 331). Myers admitted that he met J.W. after he got out of prison, sometime after Christmas, and that J.W. had spent the night at his house. (*Id*. at 337, 389-390). Myers testified that he intended to marry Stephanie on October 14, 2011 and help her raise J.W. (*Id*. at 378, 388-389). Myers also testified that he was in a fight with a friend in June 2011 that resulted in Myers being hospitalized, and that he had four or five OVI convictions. (*Id*. at 359-360, 411-412, 423).

{¶47} Kimberlie Todd, J.W.'s most recent foster parent, testified about her observations regarding Stephanie and J.W. At the time of the permanent custody hearing, Todd had been J.W.'s foster parent for nearly 14 months. (*Id*. at 439). Todd testified that when J.W. first came to her home, he was in second grade and was placed in a classroom for emotionally disturbed children. (*Id*. at 449). Todd testified that, at the time of the hearing, J.W. was in a typical third grade

classroom, although he still required accommodations. (*Id*. at 448-449). Todd testified that when J.W. first came to her house, he was afraid for his mother at night and often had nightmares about Myers killing his mother. (*Id*. at 452). Todd testified that J.W. did not like Myers because Myers was mean to his mother. (*Id*. at 481). Todd testified that she had issues with Stephanie regarding J.W.'s medical care, specifically Stephanie understanding a doctor's instructions and following up with the doctors. (*Id*. at 521-524). Todd testified that she feels J.W. has been emotionally torn between herself and Stephanie, and that he has been very distressed and overwhelmed by going back and forth between the homes. (*Id*. at 465-466). Todd testified that she thought J.W. was happier in her home, "He's healthier. He's very active. He's involved in the community. He has a lot of support from his school and his family, and all of those things combined make him much happier than he was before * * *." (*Id*. at 466).

{¶48} At the September permanent custody hearing, Stephanie testified that she believed Myers had changed and that he has a good relationship with J.W. (*Id*. at 622-625). Stephanie admitted that Myers had hit her before, but testified that he has not hurt her since he has been out of prison. (*Id*. at 698). Stephanie testified that she did not realize Myers was not permitted to be present, "if I would have realized seeing Dave was gonna cause the removal of my son I would have never

seen him." (*Id*. at 653). Stephanie testified that she did not tell anyone when she began seeing Myers again. (*Id*. at 701).

**{¶49}** At the November permanent custody hearing, Stephanie testified that she had moved into Myers' trailer because she had planned on marrying him, but that she does not feel the same about him because of an incident earlier that month. (Nov. 29, 3011 Tr. at 811, 814). According to Stephanie, she and Myers got into a fight that culminated in Myers pushing her face into the refrigerator, which caused her to lose consciousness. (*Id*. at 814-815, 864). Stephanie testified that her 21 year old daughter, Gabby, was present during the incident and that Stephanie had to go to the emergency room for her injuries. (*Id*. at 814-815, 864-866). Stephanie testified that she filed a petition for a CPO following the incident, but that the petition was dismissed when she did not attend the hearing. (*Id*. at 868-869). Stephanie testified that she is still living in Myers' trailer but that Myers is not living there. (*Id*. at 815). Stephanie testified that she does not currently have a relationship with Myers. (*Id*. at 826). Stephanie also testified that she is no longer employed. (*Id*. at 815). Stephanie admitted that she concealed her relationship with Myers because she knew it would be a potential problem in this case. (*Id*. at 835).

**{¶50}** John testified that he discovered Stephanie was back in a relationship with Myers in March 2011. (*Id*. at 962). John testified that he did not agree with

placing J.W. with Stephanie if she was seeing Myers, and that he did not want J.W. around Myers. (*Id*.). John testified that he does not have any concerns about Stephanie having custody of J.W. if Myers is no longer around and, in that case, he would like Stephanie to have custody of J.W. (*Id*. at 979); (Nov. 30, 2011 Tr. at 1028).

{¶51} Jacob Rishty, an agency social worker, testified regarding his involvement in the case. Rishty began working on the case in February 2008 after John made threatening phone calls to the previous caseworker, Erica Cleveland. (Nov. 30, 2011 Tr. at 1044-1045). Rishty testified that he supervised a visit between Stephanie and J.W. on November 11, 2011 at the agency. (*Id*. at 1047) Rishty testified that, at the end of the visit, Myers was waiting for Stephanie in the parking lot. (*Id*. at 1047-1048). Rishty testified that Stephanie left with Myers and J.W. was very frightened. (*Id*.). Rishty testified that, after a prior domestic violence incident when Myers was incarcerated, Stephanie left Myers and moved into a relative's home for a period of time. (*Id*. at 1058). Rishty testified that Stephanie ultimately returned to Myers, and he did not believe the current situation was any different. (*Id*.). Rishty testified that, although Stephanie has met many of the case plan requirements, she still has not maintained a healthy relationship or a safe home environment, which were goals under the case plan.

(*Id*. at 1088-1094). Rishty testified that Stephanie continues to have the same issues and J.W. needs a permanent home. (*Id*. at 1088).

**{¶52}** The testimony and evidence presented at trial thus demonstrate that J.W. loves his mother and misses his biological family, but has also developed a positive relationship with his foster family. (Sept. 19, 2011 Tr. at 73-79). Contrary to Stephanie's assertion, J.W. has expressed a desire to live with Stephanie, but only if Stephanie is no longer in a relationship with Myers and Stephanie can keep him safe. (Sept. 21, 2011 Tr. at 517). The evidence further demonstrates that this case has been going on for over four years, which is having a detrimental effect on J.W., and that J.W. needs a permanent home. (Sept. 20, 2011 Tr. at 465-466). Additionally, Stephanie has failed to remedy the issues that led to J.W.'s removal from the home. At the beginning of the permanent custody hearing, Stephanie intended to marry Myers, despite numerous instances of domestic violence and the termination of her temporary custody of J.W. based on her involvement with Myers. (Nov. 29, 2011 Tr. at 811). In fact, Stephanie has consistently maintained violent relationships throughout the case. (Sept. 29, 2011 Tr. at 81-82). Stephanie has thus failed to develop healthy relationships, no longer have instances of domestic violence in her home, and create a safe, stable home for J.W. as required by her case plan. (John's Ex. 1). Furthermore, Stephanie's continued relationship with Myers, and J.W.'s contact with him in

-25-

direct violation of the juvenile court's orders, is evidence of a lack of commitment to J.W. (Sept. 20, 2011 Tr. at 337, 389-390). Stephanie's intention to marry Myers after J.W.'s removal due to his contact with Myers demonstrates that Stephanie was more committed to her relationship with Myers than regaining custody of J.W. (Nov. 29, 2011 Tr. at 811). Stephanie's involvement in violent relationships thus continues to pose a threat to J.W.'s safety. After reviewing the evidence, this Court cannot find that the juvenile court erred by determining granting the agency permanent custody of J.W. was in J.W.'s best interest.

{¶53} John and Stephanie's first assignments of error are, therefore, overruled.

### John's Assignment of Error No. II

**The trial court erred in granting permanent custody of [J.W.] to Seneca County Department of Job and Family Services ("Agency") because the Agency failed to make a good faith effort to implement a reunification plan for the child and the biological mother.**

{¶54} In his second assignment of error, John argues the agency failed to make a good faith effort to reunify Stephanie with J.W. John argues Stephanie was in the process of extricating herself from a violent relationship with Myers at the time of the permanent custody hearing, and the agency should have provided Stephanie with more support during that process.

{¶55} R.C. 2151.419 requires children services agencies to make reasonable efforts to return the child to the parents. *Thomas*, 2003-Ohio-5885, at ¶ 9. The agency has the burden of showing that it made reasonable efforts towards reunification. *Id.* Consequently, the case plan must establish goals designed to address specific concerns the agency has about the parent, as well as the steps the parent can take to achieve reunification. *Id.* "[T]he issue is not whether there was anything more that [the agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances." *Id.*

{¶56} Stephanie's case plan required her to maintain healthy relationships, no longer have instances of domestic violence, and generally create a safe home environment for J.W. (John's Ex. 1). Miller testified regarding the services the agency provided to Stephanie to help her fulfill the case plan requirements, stating that they were:

> deliberated and thought out and tried to address all of the concerns that might arise for Stephanie and try to provide a support system that would be a success. They included therapy for [J.W.], SAFY intervention in the home, with parenting for [J.W.] and Stephanie, uhm, wrap-around services, uhm, counseling referrals. Uhm, I think there were, uhm, financial assistance and transportation assistance for school. * * * I know SAFY, there was Mel Proctor, the

counseling, and Cindy Weber, who would actually come into the home [and] do exercises with [J.W.] and Stephanie, trying to identify concerns. Stephanie kept journals about her interaction with [J.W.] and they would review that. Uhm, there was wrap-around services, which I think went more towards budgeting and, uhm- uhm, that kind of uhm, home maintenance and any- you know- trying to identify a concern. I can't imagine a concern that would've arose there wouldn't have been a service in place for.

(Sept. 19, 2011 Tr. at 117-118). Weber testified that she counseled Stephanie on developing healthy relationships. (*Id*. at 146-148). Rishty testified that Stephanie's plan included extensive support, including checking on J.W. at school and participating in an in-home service plan. (Nov. 29, 2011 Tr. at 1082). Rishty further testified that Stephanie had completed a rigorous 26 week domestic counseling course. (*Id*. at 1083).

{¶57} Despite the agency's efforts and the four years Stephanie had to address these issues, Stephanie continued to maintain a violent relationship with Myers and had a domestic violence incidence in October 2011, shortly before the second half of her permanent custody hearing. Stephanie thus failed to meet her case plan goals of maintaining a healthy relationship and no longer having incidences of domestic violence. (John's Ex. 1). We cannot find that the agency

failed to make a reasonable and diligent effort towards reunification in light of the extensive services and counseling it provided to Stephanie.

{¶58} John's second assignment of error is, therefore, overruled.

### Stephanie's Assignment of Error No. II

**The trial court erred by granting the permanent custody of the minor child, [J.W.], to the movant Seneca County Department of Job and Family Services, on grounds that the previous trial court order granting temporary custody of the minor, [J.W.], to the appellant mother, Stephanie Ward, did not contain any provision whatsoever prohibiting Stephanie Ward or [J.W.], from having any contact with David Myers, the then-boyfriend of the appellant mother, Stephanie Ward.**

{¶59} In her second assignment of error, Stephanie argues the juvenile court did not include an instruction for her or J.W. to not have contact with Myers in its order granting her temporary custody of J.W. Stephanie contends that the agency could not base its permanent custody motion on Stephanie's violation of an order not to have contact with Myers when the juvenile court did not include that provision in the temporary custody order.

{¶60} Stephanie does not cite to any propositions of law in support of her argument that the juvenile court can only grant permanent custody to the agency based on a violation of provisions included in the temporary custody order. According to R.C. 2151.353(B):

[n]o order for permanent custody or temporary custody of a child or

the placement of a child in a planned permanent living arrangement

shall be made pursuant to this section unless the complaint alleging the abuse, neglect, or dependency contains a prayer requesting permanent custody, temporary custody, or the placement of the child in a planned permanent living arrangement as desired * * *.

**{¶61}** Not only did the agency's motion for permanent custody clearly state its basis, but Stephanie was apprised of the issues with her violent relationships since the case's inception. Stephanie's case plan included a requirement that she maintain healthy relationships and no longer have incidences of domestic violence. (John's Ex. 1). When the juvenile court granted Stephanie supervised visits in 2008, it included in its order a requirement that Myers not be present for the visits. (Doc. No. 55). In January and June 2010 the agency and Miller filed motions for permanent custody of J.W. based on Stephanie's violent relationship with Myers. (Doc. No. 125); (Doc. No. 151). In April 2011, the juvenile court reviewed Stephanie's temporary custody of J.W. and instructed Stephanie that Myers was not permitted to have contact with J.W. (Doc. No. 204). The agency filed the motion for permanent custody that is the basis for this case on June 27, 2011. (Doc. No. 221). Stephanie thus had adequate notice that her relationship with Myers could prevent her from regaining custody of J.W.

**{¶62}** Stephanie's second assignment of error is, therefore, overruled.

{¶63} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW. P.J. and WILLAMOWSKI, J., concur.**

**/jlr**