IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

IN THE MATTER OF:                               :

    R.M., M.M, D.M., B.M.,                  :       Case No.   12CA43
                                              12CA44

                                                    :

ADJUDICATED NEGLECTED AND
DEPENDENT CHILDREN.                    :       DECISION AND JUDGMENT ENTRY

_____

APPEARANCES:

COUNSEL FOR APPELLANT:       James A. Wallace, 11 East Washington Street, P.O. Box
                                        337, Athens, Ohio 45701

COUNSEL FOR APPELLEE:        Keller J. Blackburn, Athens County Prosecuting Attorney,
                                        and Merry M. Saunders, Athens County Assistant
                                        Prosecuting Attorney, One S. Court St., Athens, Ohio
                                        45701

_____

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED: 8-14-13
ABELE, J.

{¶ 1}   This is an appeal from Athens County Common Pleas Court, Juvenile Division, judgments that awarded Athens County Children Services (ACCS) permanent custody of R.M. (born May 2, 2006), M.M. (born July 27, 2007), D.M. (born October 27, 2008), and B.M. (born June 14, 2011).

{¶ 2}   C.M., the children's natural mother and appellant herein, assigns the following errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT'S DETERMINATION THAT GRANTING PERMANENT CUSTODY TO ATHENS COUNTY CHILDREN SERVICES WAS IN THE CHILDREN'S BEST INTERESTS

WAS NOT SUPPORTED BY CLEAR AND CONVINCING
EVIDENCE."
SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT LACKED SUBJECT MATTER
JURISDICTION TO GRANT PERMANENT CUSTODY OF
B.M. TO ATHENS COUNTY CHILDREN SERVICES."

{¶ 3}   On November 3, 2010, ACCS filed complaints that alleged appellant's three children, R.M., M.M., and D.M., all with different biological fathers, were abused, neglected and dependent and requested temporary custody.[1]   Appellee also requested emergency custody of the children.

{¶ 4}   The complaint alleged that an ACCS caseworker responded to appellant's home after receiving reports that appellant's children, then ages 4, 3, and 1, were outside and unsupervised.   When the caseworker arrived at appellant's home, she observed that the home was filthy and that the one-year old child looked dirty.   A few days later, the caseworker returned to the home and observed that D.M., the one-year old child, had a dirty face, that R.M.'s face and hands were covered in old Spaghetti O's, and that M.M. was naked and appeared to have old feces stains on her buttock and inner thighs.   The caseworker returned to the home the next day and observed diapers with feces located in the first floor bathroom, and additional feces-filled diapers in the upstairs bathroom.   In the upstairs bathroom, the caseworker also observed feces on the floor.

{¶ 5}   In September 2010, ACCS received reports that appellant's children were constantly outside unsupervised, and that construction workers in the area had to be careful when operating equipment in order not to harm the children.

---

[1]   Appellant's fourth child, B.M., had not yet been born when appellee filed the November 3, 2010 complaint.

{¶ 6}   On November 2, 2010, ACCS received yet another report that appellant's children were outside unsupervised for approximately 45 minutes in thirty- to forty-degree weather.   The report indicated that the children were wearing diapers and not properly dressed for the weather (R.M. wore a pajama top and a dirty diaper; M.M. wore a shirt, thin pants, and did not have shoes; and D.M. wore only a dirty diaper).   When the ACCS caseworker arrived, she discovered that appellant had been asleep in her bedroom.   Appellant subsequently was arrested for child endangerment.

{¶ 7}   On December 15, 2010, the trial court adjudicated the children neglected children.  On January 18, 2011, the court awarded ACCS temporary custody of the three children.

{¶ 8}   On June 14, 2011, appellant gave birth to her fourth child, B.M., fathered by yet another man.   On June 16, 2011, the trial court awarded ACCS temporary emergency custody of the newborn child.   On June 20, 2011, ACCS filed a complaint that alleged B.M. to be a neglected and dependent child.   The court subsequently adjudicated B.M. a dependent child and awarded ACCS temporary custody of B.M.

{¶ 9}   On June 13, 2012, appellee filed a motion to modify all four of the children's dispositions to permanent custody.   On September 18, 2012, and continuing on October 12, 2012, the court held a permanent custody hearing.   During the hearing, appellant asserted that the trial court lacked jurisdiction over B.M.'s case.   She claimed that because she gave birth to B.M. in Kentucky, he was not an Ohio resident and an Ohio court did not have jurisdiction to issue a custody decision regarding B.M.   The court delayed ruling on the jurisdictional argument to provide ACCS the opportunity to respond.

{¶ 10}  Former ACCS caseworker Katie Murphy testified that she worked with appellant

from August 2010 to November 2011.   Murphy stated that appellant initially worked with

ACCS on a voluntary basis and agreed to a safety plan.   The safety plan required appellant to

properly supervise the children, change the diapers when needed, and maintain a clean home.

Murphy testified that ACCS referred appellant for mental health counseling, provided

parent-mentor services, conducted home visits, provided transportation, and took appellant and

the children to the doctor.   Murphy stated that after the safety plan had been in effect for less

than one week, ACCS removed the children pursuant to an emergency custody order because

appellant failed to properly supervise the children.[2]

{¶ 11} Murphy testified that after ACCS received custody of the children, appellant lost

her subsidized housing and moved in with her father and grandmother.   Murphy stated that

appellant continued to reside there until October or November 2011.   When Murphy visited the

home, she did not notice any bedrooms available for the children.   Murphy stated that appellant

eventually obtained HUD-approved housing that appeared to be adequate for the children.

{¶ 12} Murphy explained that ACCS developed a case plan for appellant that required

her (1) to attend visits with the children, (2) to attend mental health counseling, (3) to obtain

housing, and (4) to obtain her GED.   Murphy testified that she attended appellant's first mental

health counseling session.   She later learned that appellant was prohibited from returning to the

counseling center for six months.   ACCS then arranged counseling services through another

provider.

{¶ 13} Murphy stated that appellant did not obtain her GED during the time that Murphy

---

[2]  Murphy explained that ACCS received a report that the children had been outside and unsupervised.    Appellant's counsel, however, objected on the basis of hearsay.     The trial court sustained the objection.

worked with appellant, despite Murphy's recommendation that appellant need not complete work requirements but, instead, simply work on obtaining her GED. Murphy testified that appellant did not have work and that government benefits and food stamps were her sole source of income.

{¶ 14} Murphy also explained that appellant had problems with transportation, so ACCS arranged cab services to transport appellant to visitations with the children. Murphy stated that twice in 2011 when the cab arrived to pick up appellant, appellant was unavailable. Murphy explained that she requested appellant to sign an agreement that she would receive cab services under a probationary period and that if she missed one more transport, ACCS would revoke the services. Murphy testified that appellant nevertheless missed another cab pick-up and on March 11, 2011, ACCS terminated appellant's cab privileges. Murphy stated that ACCS reinstated appellant's cab privileges on June 21, 2011, but revoked them again on June 30, 2011. Murphy explained that she and other ACCS caseworkers provided transportation to appellant as their availability allowed.

{¶ 15} Integrated Services licensed social worker Amy Smith testified that she began working with appellant in May 2010. Smith stated that appellant initially was referred to Integrated Services for assistance finding housing. Smith helped appellant find subsidized housing after appellant lost her prior subsidized housing due to the children's removal. Smith stated, however, that the new subsidized housing depended upon appellant having custody of the children.

{¶ 16} Smith also worked with appellant to increase her "self-sufficiency, skill-building * * * her motivation, [and] her self-esteem." Smith stated that appellant appeared engaged in the services and that appellant had looked for employment and even appeared "excited" about

finding a job.

{¶ 17} Appellant testified that she initially contacted ACCS for assistance finding housing for her and the children. She further requested help to transport the children to doctor appointments. Appellant stated that ACCS caseworker Murphy helped her clean the house because appellant was unable to clean the house and supervise the three children at the same time. Appellant stated that she tried to ensure that the children would not leave the house unsupervised, but testified that the oldest child was able to open the doors. She stated, however, that the children were never left outside unsupervised for very long. Appellant explained that on the date ACCS initially removed the children, she had been upstairs cleaning and R.M., the oldest child (who was approximately four years old at the time) asked if he could go outside to retrieve his truck. Appellant told him that he could retrieve the truck as long as he came back into the house. She stated that she did not leave him unsupervised because she could see him from the upstairs window. She saw the other two children outside with R.M. and "kn[e]w that they was [sic] just going to grab that truck and bring it back in." Appellant testified that five to ten minutes later, one of her neighbors came over and told her that ACCS "had been called because my kids were outside."

{¶ 18} Appellant stated that she went to Tri-County Mental Health pursuant to ACCS's request. She also admitted that she missed three visits and that TCMH then placed her on probation for six months.

{¶ 19} Appellant stated that when ACCS initially removed the children, she lost her subsidized housing and moved in with her mother and grandmother. In October 2011, appellant obtained new subsidized housing where she remained for approximately nine months.

Appellant explained that she eventually lost that subsidized housing because she did not have custody of the children and because ACCS did not permit home visits with the children. At that point, appellant moved in with her fiancé's family.

{¶ 20} Appellant stated that she did not understand why ACCS would not permit home visits because she believed that she did "everything" that the case plan required her to do. She admitted, however, that she did not consistently attend visits with the children and that she requested ACCS to drop the one visit per week she had scheduled with the newborn child, B.M. Appellant testified that ACCS claimed she failed to change the children's diapers as needed. Appellant stated, however, that she believed she complied with the diaper checklist that ACCS caseworkers provided. She testified that she changed the diaper at least once over the course of the two-hour visit and that the child "only needed changed once or twice." Appellant explained that ACCS requested that she change the diaper at least twice per visit. Appellant stated that she then began changing the diaper twice.

{¶ 21} Appellant testified that she brought diapers to the visits as ACCS requested, but admitted that she did forget on some occasions. She stated that when B.M. was a newborn, she brought formula for him. Appellant explained that ACCS informed her that she brought the wrong formula and threw it away. She stated that ACCS then gave her a container of the proper formula so that she would know which type to bring on the next visit. Appellant claimed that she would bring this same formula to the next visit, but ACCS would tell her it was the wrong one. At that point, appellant "gave up." Appellant stated that ACCS kept changing the type of formula due to "digestible issues."

{¶ 22} Appellant further explained that once B.M. was a little older, she brought baby

food instead of formula because she only had $100 on her food stamp card and his formula cost about $20. She explained that she also needed to use the $100 to purchase food for the other three children.

{¶ 23} Appellant stated that in the summer 2011, she passed a GED pre-test and that she only needs to pay $4 to take the test to complete her GED. Appellant testified that she has not yet taken the test because she does not think she is ready.

{¶ 24} Appellant explained that she attempted to enroll at Hocking College, but discovered that she would need her GED to graduate. She stated that she went to Hocking College for three months, then dropped out.

{¶ 25} Appellant testified that she presently lives with her fiancé, her fiancé's mother, her fiancé's step-father, and her fiancé's grandfather. She stated that the children could live with her and her fiancé's family. Appellant explained that the ACCS caseworker visited the home once.

{¶ 26} Appellant testified that she and her fiancé are in the process of fixing up a trailer and will be moving into it next month. Appellant believes that with her fiancé in her life, she will be able to supervise and care for the children properly.

{¶ 27} Tri-County Mental Health counselor Micki Lamb stated that she began counseling R.M. in January 2011. She explained that she has helped R.M. cope with the adjustment to foster care, manage anxiety, and build social skills. Lamb also testified that R.M. had "a lot of aggression toward his siblings." She stated that R.M. has improved since he began counseling. Lamb diagnosed R.M. with "at least partially largely resolved post traumatic stress and * * * attention deficit hyperactivity disorder." She explained that she also is trying to "rule out * * *

any other particular mood disorder."   Lamb stated that R.M. still has anxiety about the state of

uncertainty regarding his home life.

{¶ 28} Lamb explained the type of home life R.M. needs:   "He would need structure.

He would need consistency.   He would need a warm consistent environment.   He'd need to

know that if he was distressed somebody could help him.   He'd need somebody that could

coordinate with the schools to make sure that behavior plans and things like that were being

followed through on."

{¶ 29} John Patterson, one of the children's foster parents, stated that the children have

lived continuously in his home since their removals.   He explained that when the children first

entered the home, R.M. had behavioral issues and R.M. and M.M. had problems with their teeth.

 Patterson testified that R.M. had two healthy teeth in his mouth, four had to be pulled, some

were filled, and others were capped.   He stated that M.M. had four teeth pulled and four fillings.

 Patterson further explained that the children had skin conditions.   R.M. and M.M. both had a

fungus infection on their bottoms, and D.M. had a boil.   He stated that the children also had not

received all of their immunizations.

{¶ 30} Jennifer Pinney stated that she was appellant's parent-mentor from September

2010 to March 2012.   She explained that the concerns were as follows: (1) appellant did not

properly supervise the children; (2) appellant did not provide proper basic care for the children;

(3) appellant did not change diapers when needed; and (4) appellant did not have sufficient food

in the home.   Pinney testified that appellant did not remedy any of the concerns.   She stated that

ACCS purchased diapers and talked to appellant about nutrition, but "nothing was being done."

Pinney testified that appellant did not want to work on any goals–appellant told Pinney, "I don't

do goals." Pinney stated that she tried to establish duties for appellant to follow each visit, but appellant stated "that she was not establishing even a duty."

**{¶ 31}** Pinney explained that during the supervised visitations, she never observed appellant make any progress in being able to change the children's diapers when needed. She stated that ACCS repeatedly discussed with appellant the need to change the children's diapers in a prompt manner, but appellant did not comply. Pinney testified that before the children were removed, "there was feces coming out of the side of the diaper and we were having the same issues during visitation even when a visitation worker would tell her that the child's diaper needed changed it wouldn't be changed."

**{¶ 32}** Pinney further explained that she did not see appellant provide the children with nutritious food, but instead, noticed that appellant gave the children candy and other "inappropriate foods." Pinney stated that ACCS encouraged appellant not to give the children candy, yet she continued to do so.

**{¶ 33}** Pinney additionally testified that appellant did not consistently attend her scheduled visits with the children. She stated that between October 26, 2010 and September 27, 2012, appellant had 188 scheduled visits and appellant, but did not appear for thirty-three visits and canceled nineteen. Pinney explained that the missed and canceled visits did not include the time when ACCS removed her from the "visitation board" between March 2, 2012 and May 14, 2012. Pinney stated that between February and May 2012, appellant had only three visits.

**{¶ 34}** Pinney testified that on March 9, 2012, she terminated the parent-mentor services because appellant missed multiple visits and displayed a significant lack of progress. She stated that appellant "refused to implement suggestions and direction given to her by the

parent/mentor." Pinney explained that ACCS informed appellant that she should not "prop the bottle" when feeding B.M., that she should change the diaper without prompting, and that she should brush the children's teeth during visitation. Pinney stated, however, that appellant made no progress toward these goals. Pinney explained that she (1) requested appellant to bring diapers for B.M., but she did not; and (2) requested appellant to bring formula for B.M., but she would bring the wrong formula, expired formula, or she did not bring it at all. Pinney testified that despite all of the prompting and encouragement that ACCS provided to appellant, appellant has yet to demonstrate that she can consistently provide for the children's basic needs, even during supervised visitations. Pinney also stated that appellant had some positive interactions with the children: (1) appellant read to them; (2) they showed affection for one another; and (3) appellant provided appropriate meals for the children. She further explained, however, that appellant was unable to engage in these positive interactions on a consistent basis.

{¶ 35} Pinney testified that she did not believe that B.M. had bonded to appellant. She stated that B.M. "[o]ften times * * * sits during visitation away from [appellant] facing away from [appellant] in a stroller, not paying attention." Pinney further explained that appellant continues to have "some serious supervision" issues. She stated that appellant and ACCS staff members took the children to COSI in Columbus and "[i]t took two other staff members making sure that we had an eye on each one of the children because [appellant] wasn't doing, cause she would take off with one of the children and not pay attention to where the other ones were." Pinney further explained: "[Appellant] did not supervise all of her children or even try to do so[. S]he also would walk off especially with [R.M.] and just try to leave the other children and w[a]nder. The other children to w[a]nder and push [B.M.] in the stroller. [sic]"

{¶ 36} ACCS worker Mandi Knowlton testified that she did not believe that appellant properly supervised the children on a consistent basis. She explained that during one observation, she had noticed the children playing on the playground and R.M. was pushing B.M. in the stroller "kind of recklessly." Knowlton stated that she believes appellant loves her children. She explained that the children "are usually very happy to see [appellant]," and that they recognize her as their mother. Knowlton testified that during some visits, appellant read stories to the children, listened to music, and played appropriately.

{¶ 37} ACCS caseworker Kathi Vanmeter stated that she started working with appellant in December 2011. She testified that the case plan required appellant to attend visits with the children and to ensure that the children's needs were met during visits. The case plan further required appellant to (1) follow the guidelines, (2) supervise the children, (3) attend counseling for her mental health needs, (4) change diapers when needed, (5) find appropriate housing, (6) maintain a clean home, and (7) work on obtaining her GED.

{¶ 38} Vanmeter testified that appellant had HUD housing in Nelsonville, but that she no longer has it. Vanmeter stated that appellant provided two different reasons why she no longer has HUD housing. Vanmeter explained that appellant told Vanmeter that she lost HUD housing because her fiancé/boyfriend had been living there, but on another occasion, appellant told Vanmeter that she gave it up because "she was tired of the neighbors."

{¶ 39} Vanmeter stated that appellant currently lives with appellant's fiancé/boyfriend, his mother, and his grandfather. Vanmeter attempted to visit the home, but appellant would not allow her inside the home.

{¶ 40} Vanmeter explained that she believes awarding ACCS would serve the children's

best interests because they "need to be in a permanent home. They need to have stability in the home, in their life, and they need to know what's going to happen, what is current with them. They need to make sure someone is able to provide, you know, to get them to their appointments." She does not believe that appellant can provide these things: "[J]ust the concerns with the housing and from what I've observed since I've had the case, uh, the concerns about the income and her you know, [her fiancé is] going to be the one to provide for her and his income but also she's looking at him to, you know, to get the trailer ready and so she hasn't made attempts to even move into the place."

{¶ 41} Alan Boyd, the children's guardian ad litem, testified that it is in the children's best interests to be placed in a home together and raised by a "stable good supportive family." He stated that he does not believe that appellant presently is able to provide a stable, supportive family life for the children. Boyd testified that appellant has not been able to maintain an adequate income, to maintain a home environment for longer than seven months, or to maintain a stable relationship. Boyd stated that he believes that awarding ACCS permanent custody would be in the children's best interests.

{¶ 42} On November 5, 2012, the trial court awarded ACCS permanent custody of appellant's four children. The court first rejected appellant's argument that it lacked jurisdiction over B.M. and reasoned:

> "In spite of mother's choice to deliver in a hospital in Kentucky, the child
> was a resident of Athens County, Ohio, at the time of his removal by virtue of his
> mother's continued residency here. R.C. 2151.06; R.C. 2151.27(A)(1), and
> Juv.R. 10(A). Additionally, the facts establishing dependency occurred in Athens

County.   R.C. 2151.04(D), R.C. 2151.24(A)(1).   Finally, the matter is res judicata as the issue would be one of personal jurisdiction and was not raised in a direct appeal of the adjudication and original disposition of September 12, 2011.”

{¶ 43}  The court next found that awarding appellee permanent custody of the children would serve their best interests.   The court considered the children's interactions and interrelationships:

> "All of the children are placed together and appear to be bonded with each other.   The foster parents report that the children appear to be bonding with them.   The fathers have not developed any bond with their respective children either because they are unwilling or disinterested.   Mother was given many opportunities to visit with these children throughout the life of this case, but proved woefully inconsistent in that regard.   The children appear to love her, and some aspects of the interactions were appropriate, but mother demonstrated that she could not handle the mother-child relationship on a consistent, sustained basis."

The court further noted that B.M., the youngest child, was removed from appellant's care almost immediately upon his birth and has never lived with either appellant or the father.

{¶ 44}  The court determined that none of the children were sufficiently mature to express their wishes in a rational manner.   Regarding the three older children, the court explained:

> "The children are currently ages, six, five, and almost four.   They have not lived with mother (even trial visits) since November 2010.   The oldest children express a desire to see their mother, but due to their ages, immaturity, and lack of historical perspective, little weight can be given to these expressions as it might relate to custodial choices.   It is certainly true that mother expresses love for the children and the children return that love."

{¶ 45}  Regarding B.M.'s custodial history, the court found:   "The child has spent his brief but entire life in foster care, having been placed there at birth.   This motion for permanent custody was filed June 13, 2012, and the child was adjudicated dependent on July 29, 2011."

With respect to the three oldest children's custodial history, the court noted that the children were adjudicated on December 15, 2010, that ACCS filed the permanent custody motion on June 13, 2012, and that the children have been in foster care and ACCS's temporary custody during that entire time.

{¶ 46} The court found that all four children need and deserve a legally secure placement that can only be secured by a grant of permanent custody to ACCS.

{¶ 47} The court additionally determined that the children's fathers had no significant involvement in their lives and that they had abandoned the children.

{¶ 48} In B.M.'s case, the court examined R.C. 2151.414(E)4) and (10) and determined that the child cannot be placed or should not be placed with either parent within a reasonable time. The court explained:

> "[Appellant] has proven wholly incapable of establishing and maintaining a permanent home for her children. From the onset of these cases it has been clear that mother is herself a dependent, either on government and social services assistance of the kind actions of others. From the earliest Court involvement, mother was failing to provide adequate food, clothing, health care, and supervision for her children. Since the removal of the children, mother has moved numerous times and never had a residence acceptable enough for even a home visitation. She has demonstrated a lack of commitment to case plan activities and cannot provide for her children. She has neither a high school diploma nor a GED, and has no employment history or skill set that would suggest any improvement in the future."

{¶ 49} The court additionally observed that appellant was one hour late for the final day of the permanent custody hearing and that she consistently failed to appear at various hearings involving the children.

{¶ 50} The court thus determined that awarding ACCS permanent custody of the children would serve their best interests and terminated appellant's parental rights. This appeal followed.

I

{¶ 51} In her first assignment of error, appellant asserts that the trial court erred by awarding ACCS permanent custody.   Specifically, appellant contends that the record does not contain clear and convincing evidence to support the court's finding that awarding ACCS permanent custody of the four children would serve their best interests.   Appellant claims that the evidence shows that she established a "strong, loving bond" with the children and that she simply was "overwhelmed by the difficult task of raising three very young children without emotional or financial assistance from their fathers."   Appellant asserts that if she had received further financial support from the children's fathers, then "she probably could have dealt with the children's problems as effectively as the foster parents."

{¶ 52} Within her first assignment of error, appellant argues that the standard of review we traditionally have applied in permanent custody cases is too deferential.   She contends that when the burden of proof at trial is clear and convincing, then a reviewing court must find more than "some competent and credible evidence" to affirm the judgment.   Appellant asserts that in a permanent custody case, where the burden of proof is clear and convincing, then a reviewing court must examine the record to determine whether clear and convincing indeed exists to support the trial court's judgment.

A

STANDARD OF REVIEW

{¶ 53} A reviewing court will generally not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence.   See In re M.H., 4th Dist. No. 11CA683, 2011-Ohio-5140, ¶29; In re A.S., 4th Dist. Nos. 10CA16, 10CA17, 10CA18,

2010-Ohio-4873, ¶7.   Accord In re K.M., 6th Dist. No. L-12-1345, 2013-Ohio-1477, ¶25; In re

J.H., 11th Dist. No. 2012-L-126, 2013-Ohio-1293, ¶91; In re R.G., 10th Dist. No. 12AP-748,

2013-Ohio-914, ¶15; In re D.W., 8th Dist. No. 98717, 2013-Ohio-272, ¶7.   "'Weight of the

evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial,

to support one side of the issue rather than the other.   It indicates clearly to the jury that the party

having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their

minds, they shall find the greater amount of credible evidence sustains the issue which is to be

established before them.   Weight is not a question of mathematics, but depends on its effect in

inducing belief."'"   Eastley v. Volkman, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517,

¶12, quoting State v. Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997) quoting

Black's Law Dictionary 1594 (6th ed. 1990).

{¶ 54} When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" Eastley[3]

at ¶20, quoting Tewarson v. Simon, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001),

quoting Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin, 20 Ohio App.3d 172, 175,

485 N.E.2d 717 (1st Dist. 1983).   Accord In re Pittman, 9th Dist. No. 20894, 2002-Ohio-2208,

¶¶23-24.

---

[3] The Eastley court clarified that the manifest weight standard that applies in criminal cases also applies in civil cases. Eastley at ¶17 and ¶23.

{¶ 55} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." In re K.H., 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶43. "Clear and convincing evidence" is:

> "The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."

In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." State v. Schiebel, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). Accord In re Holcomb, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985),[4] citing Cross v. Ledford, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). Accord In re Adoption of Lay, 25 Ohio St.3d 41, 42-43, 495 N.E.2d 9 (1986). Cf. In

---

[4] Curiously, in Holcomb, the court "independent[ly] review[ed]" the record when determining whether an adoption petitioner proved, by clear and convincing evidence, that the respondent lacked justifiable cause for failing to communicate with his children. Id. at 370. It acknowledged in a footnote that the court of appeals had "apparently applied a 'manifest weight of the evidence test.'" The court determined that to the extent that the appellate court had applied a manifest weight of the evidence standard, "its error [was] harmless in light of our independent review of the record." Approximately nine months later in another adoption case, however, the Ohio Supreme Court stated: "The question of whether justifiable cause for failure to pay child support has been proven by clear and convincing evidence in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence." Masa, paragraph two of the syllabus.

re Adoption of Masa, 23 Ohio St.3d 163, 165, 492 N.E.2d (1986) (stating that whether a fact has

been "proven by clear and convincing evidence in a particular case is a determination for the

[trial] court and will not be disturbed on appeal unless such determination is against the manifest

weight of the evidence").   Thus, if the children services agency presented competent and

credible evidence upon which the trier of fact reasonably could have formed a firm belief that

permanent custody is warranted, then the court's decision is not against the manifest weight of

the evidence.   In re R.L., 2nd Dist. Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, ¶17,

quoting In re A.U., 2nd Dist. No. 22287, 2008-Ohio-187, 9 ("A reviewing court will not overturn

a court's grant of permanent custody to the state as being contrary to the manifest weight of the

evidence 'if the record contains competent, credible evidence by which the court could have

formed a firm belief or conviction that the essential statutory elements * * * have been

established.'"); In re J.W., 3rd Dist. No. 13-12-10, 2012-Ohio-3528, ¶35, quoting In re Baby Boy

W., 3rd Dist. No. 5-10-39, 2011-Ohio-2337, ¶20 ("This Court will not overturn the juvenile

court's judgment as being against the manifest weight of the evidence 'if the record contains

competent, credible evidence by which the court could have formed a belief or conviction that

the essential statutory elements for a termination of parental rights have been established.'"); In

re M.Z., 9th Dist. No. 11CA010104, 2012-Ohio-3194, ¶22; In re K.N., 1st Dist. No. 120111,

2012-Ohio-2189, ¶12 ("A reviewing court will not reverse the judgment of a trial court as being

against the manifest weight of the evidence if the record contains some competent, credible

evidence from which the court could have found that the essential statutory elements for

permanent custody had been established by clear and convincing evidence.").

{¶ 56} Once the reviewing court finishes its examination, the court may reverse the

judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"  Thompkins, 78 Ohio St.3d at 387, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).   A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"  Thompkins, 78 Ohio St.3d at 387, quoting Martin, 20 Ohio App.3d at 175; accord State v. Lindsey, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 57}  Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. Eastley at ¶21.   As the Eastley court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * *
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"

Quoting Seasons Coal Co., Inc. V. Cleveland, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

{¶ 58}  Moreover, as this court previously explained in State v. Murphy, 4th Dist. No. 07CA2953, 2008–Ohio–1744, ¶31:

> "It is the trier of fact's role to determine what evidence is the most credible and convincing.   The fact finder is charged with the duty of choosing between two competing versions of events, both of which are plausible and have some factual support.   Our role is simply to insure the decision is based upon reason and fact.   We do not second guess a decision that has some basis in these two factors, even if we might see matters differently."

Accord Bugg v. Fancher, Highland App. No. 06CA12, 2007–Ohio–2019, ¶9.  Additionally,

deferring to the trial court on matters of credibility is "crucial in a child custody case, where there

may be much evident in the parties' demeanor and attitude that does not translate to the record

well (Emphasis sic)."  Davis v. Flickinger, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

Accord In re Christian, 4th Dist. No. 04CA 10, 2004–Ohio–3146, ¶7.  As the Ohio Supreme

Court long-ago explained: "In proceedings involving the custody and welfare of children the

power of the trial court to exercise discretion is peculiarly important.   The knowledge obtained

through contact with and observation of the parties and through independent investigation can

not be conveyed to a reviewing court by printed record."  Trickey v. Trickey, 158 Ohio St. 9, 13,

106 N.E.2d 772 (1952).   Furthermore, unlike an ordinary civil proceeding in which a jury has no

contact with the parties before a trial, in a permanent custody case, a trial court judge may have

significant contact with the parties before a permanent custody motion is even filed.   In such a

situation, it is not unreasonable to presume that the trial court judge had far more opportunities to

evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a

mere reading of the permanent custody hearing transcript.

{¶ 59}  We also observe that Eastley did not entirely do away with the C.E. Morris Co.

"some competent, credible evidence" standard that we have applied in the past.   Instead, the

Eastley court explained that "[t]he phrase 'some competent, credible evidence' * * * presupposes

evidentiary weighing by an appellate court to determine whether the evidence is competent and

credible."   Id. at 15 (emphasis in Eastley).   Accordingly, even in a permanent custody case

where the burden of proof is clear and convincing, we will not substitute our judgment for the

trial court's as long as some competent, credible, evidence indeed exists.   E.g., In re K.M. at

¶25; In re R.G., supra; In re M.H., 2nd Dist. No. 25084, 2012-Ohio-5216, ¶13.

{¶ 60}  Given the foregoing, we reject appellant's argument that our standard of review in

a permanent custody case is more stringent than one "applicable to more mundane and less

permanent matters."   The manifest weight standard remains the same.   See Eastley at ¶17

(stating that civil cases are not treated "differently from criminal cases with regard to appellate

review on the issues of sufficiency and manifest weight").   In civil and criminal, and by analogy

permanent custody–cases, "evidence must * * * exist on each element (sufficiency) and the

evidence on each element must satisfy the burden of persuasion (weight)."   Id. at ¶19.

{¶ 61}  To the extent that prior decisions from this court applied a more deferential "civil"

manifest weight standard, the Ohio Supreme Court's 2007 decision in State v. Wilson, 113 Ohio

St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, appeared to sanction such a standard.   In Wilson,

the court clearly distinguished between a civil and a criminal manifest weight of the evidence

standard and stated that the civil standard is more deferential.   Id. at ¶¶24-26.   Accord In re

M.H., 9th Dist. No. 09CA28, 2009-Ohio-6911, ¶¶11-13.   After Eastley, however, Wilson's

distinction between civil and criminal manifest weight standards appears to have limited or no

validity.

{¶ 62}  Despite Eastley's attempt to clarify the manifest weight standard of review, we

believe that cause for confusion persists.   Eastley appears to endorse the "some competent,

credible evidence" standard, yet it also states that it is the same standard that applies in criminal

cases.   In criminal cases, however, the Ohio Supreme Court, this court, and others have framed

the issue as whether the record contains "substantial competent, credible evidence."   E.g., State

v. Stallings, 89 Ohio St.3d 280, 289, 731 N.E.2d 159 (2000); State v. Getsy, 84 Ohio St.3d 180, 193-194, 702 N.E.2d 866 (1998); State v. Davis, 4th Dist. No. 12CA3336, 2013-Ohio-1504, ¶15; State v. Miles, 8th Dist. No. 81480, 2003-Ohio-2651, ¶33.   Furthermore, in In re Mullen, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302, ¶15, the court cited two cases with approval, one after the other: Masitto v. Masitto, 22 Ohio St.3d 63, 488 N.E.2d 857 (1986); and Bechtol v. Bechtol, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990), syllabus.   In Masitto, the court used the C.E. Morris "some [competent], credible evidence" standard to review the trial court's factual finding.  Id. at 66 (emphasis added).   In Bechtol, the court stated: "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court."[5]   Id. at syllabus (emphasis added).   Although we may be in error, we nevertheless believe that a difference exists between "some" evidence and "substantial" evidence.   The Ohio Supreme Court, however, seems to use the terms interchangeably.   Perhaps the Ohio Supreme Court will have an opportunity to clarify whether a manifest weight standard of review involves a consideration of whether the record contains "some" or "substantial" competent, credible evidence.   For now, no matter the standard of review terminology that courts (including this court) have used, we believe that the essential question that we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is whether the greater amount of competent, credible evidence presented at trial produced in the trier of fact's mind a firm belief or conviction

---

[5]  Davis v. Flickinger presents another reason why confusion may persist.   Flickinger describes the standard of review applicable to custody proceedings as "abuse of discretion."   It then cites the Bechtol "substantial amount of credible and competent evidence" standard.   Id. at 418.   We observe, however, that neither case involved a trial court's award of permanent custody to a children services agency.

that permanent custody was warranted.   See In re J.P.B., 4th Dist. No. 12CA34, 2013-Ohio-787

(observing that clear and convincing evidence supported trial court's permanent custody award);

In re R.S., 4th Dist. No. 11CA29, 2012-Ohio-2016 (same).

B

PERMANENT CUSTODY PRINCIPLES

{¶ 63}  A parent has a "fundamental liberty interest" in the care, custody, and

management of his or her child and an "essential" and "basic civil right" to raise his or her

children.   Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re

Murray, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990); accord In re D.A., 113 Ohio St.3d 88,

2007-Ohio-1105, 862 N.E.2d 829.   A parent's rights, however, are not absolute.   D.A. at ¶11.

Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate

welfare of the child, which is the pole star or controlling principle to be observed.'"   In re

Cunningham, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting In re R.J.C., 300 So.2d

54, 58 (Fla.App.1974).   Thus, the state may terminate parental rights when a child's best interest

demands such termination.   D.A. at ¶11.

{¶ 64}  Before a court may award a children services agency permanent custody of a

child, R.C. 2151.414(A)(1) requires the court to hold a hearing.   The primary purpose of the

hearing is to allow the court to determine whether the child's best interests would be served by

permanently terminating the parental relationship and by awarding permanent custody to the

agency.   See R.C. 2151.414(A)(1).   Additionally, when considering whether to grant a children

services agency permanent custody, a trial court should consider the underlying principles of

R.C. Chapter 2151:

(A) To provide for the care, protection, and mental and physical development of children * * *;

* * *

(B) To achieve the foregoing purpose[], whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.

C

PERMANENT CUSTODY FRAMEWORK

{¶ 65} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that:

(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶ 66} Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interests.

{¶ 67} In the case at bar, appellant does not challenge the trial court's R.C.

2151.414(B)(1) findings.    Instead, she limits her argument to the trial court's best interest

findings.    Thus, we do not address the court's R.C. 2151.414(B)(1) findings.

D

BEST INTERESTS

{¶ 68} R.C. 2151.414(D) requires a trial court to consider specific factors to determine

whether a child's best interests will be served by granting a children services agency permanent

custody. The factors include: (1) the child's interaction and interrelationship with the child's

parents, siblings, relatives, foster parents and out-of-home providers, and any other person who

may significantly affect the child; (2) the child's wishes, as expressed directly by the child or

through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's

custodial history; (4) the child's need for a legally secure permanent placement and whether that

type of placement can be achieved without a grant of permanent custody to the agency; and (5)

whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[6]

---

[6] R.C. 2151.414(E)(7) to (11) provide as follows:

(7) The parent has been convicted of or pleaded guilty to one of the following:
(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense

{¶ 69} In the case at bar, competent and credible evidence exists from which the trial court could have formed a firm belief that awarding ACCS permanent custody would serve the children's best interests. Regarding the first best interest factor (the child's interaction and interrelationships), the evidence shows that appellant loves her children and would like to maintain her mother-child bond with the children. The evidence also shows that the children appeared happy to see their mother, displayed affection toward her, and recognized appellant as their mother. Unfortunately, however, appellant has been unable to maintain a home environment that would allow her to share home interaction with the children. She showed promise by obtaining a sizeable subsidized home, but she either lost that housing because she instead chose to live with her fiancé or she gave up the housing because she was "tired of dealing

described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense[.]

with the neighbors." Neither reaction shows a mother who is firmly committed to being reunited with her children in a home setting. Thus, throughout the history of the case, appellant's interactions with the children have been limited to supervised or monitored visits. During these visits, ACCS caseworkers did not believe that appellant adequately supervised the children on a consistent basis. While ACCS caseworkers admittedly observed some positive mother-child interactions, they also observed appellant failing to supervise one or more children or failing to properly interact with the youngest child. Furthermore, the ACCS caseworkers stated that appellant failed to maintain consistent visitation. She did not show up for thirty-three scheduled visits and canceled nineteen.

{¶ 70} The four children presently live in the same foster home where all of their basic needs appear to be met. The oldest child has undergone counseling and has improved his behavioral issues since being removed from appellant's custody. The trial court found that the children are bonded to each other.

{¶ 71} With respect to the next best interest factor (the child's wishes), the court determined that the children are not mature enough to express their wishes. We observe, however, that the guardian ad litem recommended that the court award ACCS permanent custody.

{¶ 72} Regarding the third best interest factor (the child's custodial history), the evidence shows that the three oldest children had been in ACCS's temporary custody for approximately eighteen months when ACCS filed for permanent custody. The youngest child had been in ACCS's temporary custody for nearly his entire one-year-old life when ACCS filed for permanent custody. At no point during B.M.'s life did he live with appellant. The three oldest

children have not lived with appellant since their removal in November 2010.   All of the

children have remained in the same foster home since their removals.

{¶ 73} With respect to the fourth factor (the child's need for a legally secure permanent

placement and whether that placement can be achieved without a grant of permanent custody),

the evidence demonstrates that the children need a legally secure permanent placement which

they cannot achieve without a grant of permanent custody.   Appellant has demonstrated that she

is not capable of maintaining a safe, stable, permanent home for the children.   While she has

made attempts and showed some promise, she also gave up suitable housing because she was

tired of the neighbors or because she wanted to live with her boyfriend/fiancé.   She thus appears

to have elevated her own desires (with respect to her disagreements with the neighbors or with

respect to her boyfriend/fiancé) over her desire to have the children returned to her in a suitable

home environment.   Moreover, the ACCS caseworkers testified that appellant, despite repeated

prompting, failed to provide for the children's most basic needs on a consistent basis.

Furthermore, ACCS did not locate any other suitable legally secure permanent placement.   Thus,

without a grant of permanent custody to ACCS, the children lack a legally secure permanent

placement.

{¶ 74} Consequently, we believe that the foregoing facts constitute competent and

credible evidence from which the trial court reasonably could have formed a firm belief that

permanent custody would serve the children's best interests.   Even if the facts show that

appellant has some admirable qualities, the facts sufficiently demonstrate that she has been

unwilling to provide consistent and proper care for her children.   The children's best interests

demand more than inconsistent care, supervision, housing, and food.   Although appellant

showed some promise, sadly she failed to live up to her potential. She had nearly a year and one-half to show that she is capable of providing a suitable home environment and proper care for her three older children, yet during that time, she could not demonstrate these capabilities on a consistent basis. When B.M. was born, she similarly failed to these capabilities on a consistent basis. We do not take appellant's progress obtaining housing lightly, but we observe that appellant either gave it up or lost it due to her own actions. Her decision to give it up or lose it was not based upon any reason regarding the children's safety. Instead, she placed her personal desires regarding her living arrangements over the living arrangements that would best serve her children. Placing one's personal, non-essential interests and desires over one's children's best interests does not display the actions of a parent intent on regaining custody of his or her children. Thus, the trial court's decision is not against the manifest weight of the evidence.

**{¶ 75}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

**{¶ 76}** In her second assignment of error, appellant asserts that the trial court improperly determined that it had jurisdiction to award ACCS temporary emergency custody of B.M. Appellant argues that when a children services agency seeks temporary emergency custody of a child, then R.C. 3127.18(A) (not R.C. 3127.15) applies. Appellant contends that the court lacked jurisdiction to award ACCS temporary emergency custody under R.C. 3127.18 because B.M. was born in Kentucky and was not present in the state of Ohio when the court asserted its jurisdiction.

{¶ 77} Appellant additionally asserts that the trial court improperly determined that her jurisdictional challenge was "res judicata." Appellant contends that the UCCJEA delineates a trial court's power to issue a child custody decision and thus defines its subject-matter jurisdiction. Appellant correctly observes that issues relating to a court's subject matter jurisdiction may be raised at any time and can never be waived.

> "'Jurisdiction' means 'the courts' statutory or constitutional power to adjudicate the case.' (Emphasis omitted.) Steel Co. v. Citizens for a Better Environment (1998), 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210; Morrison v. Steiner (1972), 32 Ohio St.2d 86, 87, 61 O.O.2d 335, 290 N.E.2d 841, paragraph one of the syllabus. The term encompasses jurisdiction over the subject matter and over the person. State v. Parker, 95 Ohio St.3d 524, 2002–Ohio–2833, 769 N.E.2d 846, ¶22 (Cook, J., dissenting). Because subject-matter jurisdiction goes to the power of the court to adjudicate the merits of a case, it can never be waived and may be challenged at any time. United States v. Cotton (2002), 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860; State ex rel. Tubbs Jones v. Suster (1998), 84 Ohio St.3d 70, 75, 701 N.E.2d 1002."

Pratts v. Hurley, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶11. "'The existence of the trial court's subject-matter jurisdiction is a question of law that we review de novo.'" Barber v. Williamson, 4th Dist. No. 11CA3265, 2012-Ohio-4925, ¶12, quoting Yazdani-Isfehani v. Yazdani-Isfehani, 170 Ohio App.3d 1, 2006-Ohio-7105, 865 N.E.2d 924, ¶20; accord In re E.G., 8th Dist. No. 98652, 2013-Ohio-495, ¶9.

{¶ 78} R.C. 2151.23(A)(2) provides that the juvenile court has exclusive original jurisdiction to determine custody of a child who is not a ward of a court of this state. R.C. 2151.23(F)(1) further provides, however, that a juvenile court must exercise that jurisdiction in accordance with R.C. Chapter 3127, the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). Rosen v. Celebrezze, 117 Ohio St.3d 241, 2008-Ohio-853, 883 N.E.2d 420, ¶46 (explaining that even though a statute provides a juvenile court with "basic statutory

jurisdiction to determine custody matters[,] * * * a more specific statute like R.C. 3127.15 [may]

patently and unambiguously divest[] the court of such jurisdiction").

{¶ 79} The UCCJEA defines a trial court's subject-matter jurisdiction to issue a child

custody determination.   See Rosen at ¶44 (stating that erroneous exercise of jurisdiction under

the UCCJEA "is not a mere error in the exercise of jurisdiction; it is a defect in the Ohio court's

subject-matter jurisdiction").   Thus, claimed errors in exercising jurisdiction under the UCCJEA

"cannot be waived."   Id. at ¶45.   In the case sub judice, we therefore agree with appellant's

argument that the trial court improperly determined that she could no longer challenge its

jurisdiction after the adjudication and initial disposition phases.   Our agreement with her

argument, however, ends there.

{¶ 80} R.C. 3127.15(A) sets forth "the exclusive jurisdictional basis for making a child

custody determination by a court of this state."   R.C. 3127.15(B).   R.C. 3127.15(A) states:

> (A) Except as otherwise provided in section 3127.18 of the Revised Code,
> a court of this state has jurisdiction to make an initial determination in a child
> custody proceeding only if one of the following applies:
> (1) This state is the home state of the child on the date of the
> commencement of the proceeding, or was the home state of the child within six
> months before the commencement of the proceeding and the child is absent from
> this state but a parent or person acting as a parent continues to live in this state.
> (2) A court of another state does not have jurisdiction under division
> (A)(1) of this section or a court of the home state of the child has declined to
> exercise jurisdiction on the basis that this state is the more appropriate forum
> under section 3127.21 or 3127.22 of the Revised Code, or a similar statute of the
> other state, and both of the following are the case:
> (a) The child and the child's parents, or the child and at least one parent or
> a person acting as a parent, have a significant connection with this state other than
> mere physical presence.
> (b) Substantial evidence is available in this state concerning the child's
> care, protection, training, and personal relationships.
> (3) All courts having jurisdiction under division (A)(1) or (2) of this

section have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 3127.21 or 3127.22 of the Revised Code or a similar statute enacted by another state.

(4) No court of any other state would have jurisdiction under the criteria specified in division (A)(1), (2), or (3) of this section.

{¶ 81} R.C. 3127.15(A) thus provides a court with four types of jurisdiction to make the initial determination in a child custody proceeding: (1) home-state jurisdiction, (2) significant-connection jurisdiction, (3) jurisdiction because of declination of jurisdiction, and (4) default jurisdiction. Rosen at ¶31. Because the primary purpose of the UCCJEA is "'to avoid jurisdictional competition and conflict with courts of other jurisdictions'" in custody matters, the UCCJEA gives "'jurisdictional priority and exclusive continuing jurisdiction to the home state.'" Rosen at ¶20, quoting In re Palmer, 12 Ohio St.3d 194, 196, 465 N.E.2d 1312 (1984), and Rosen at ¶21, quoting Annotation, Construction and Operation of Uniform Child Custody Jurisdiction and Enforcement Act, 100 A.L.R.5th 1, 20, Section 2[b] (2002).

{¶ 82} If none of the foregoing types of jurisdiction apply, a court may examine whether R.C. 3127.18, the temporary emergency jurisdiction exception, applies. In re S.S., 2nd Dist. No. 22980, 2008-Ohio-294, fn.3 (observing that R.C. 3127.18 is an exception to R.C. 3127.15). R.C. 3127.18 states that an Ohio court "has temporary emergency jurisdiction if a child is present in this state and either * * * (1) [t]he child has been abandoned[; or] (2) [i]t is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."

{¶ 83} In the case at bar, the trial court possessed home-state jurisdiction under R.C. 3127.15(A)(1). Ohio was the child's home state on the date that ACCS commenced the child

custody proceeding. R.C. 3127.01(B)(7) defines "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately preceding the commencement of a child custody proceeding and, if a child is less than six months old, the state in which the child lived from birth with [a parent] * * *." The statute further provides that "[a] period of temporary absence of any of them is counted as part of the six-month or other period." "Any of them" appears to refer to the individuals previously mentioned in the statute: the child, the child's parent(s), or a person acting as a parent.

{¶ 84} In the case sub judice, the child did not live with appellant in Ohio for at least six months immediately preceding the commencement of the child custody proceeding. Instead, the child was a mere two days old when he was removed from appellant's custody. Because the child was less than six months old, the home state is the state in which the child lived with appellant from birth. B.M., however, did not physically live in Ohio with appellant at any point from his birth. Instead, he was born in Kentucky and remained in Kentucky for two days, until ACCS assumed temporary custody. Appellant undeniably lived in Ohio before she gave birth to the child in Kentucky. Appellant did not move to Kentucky and the record contains no evidence that she intended to move to Kentucky. Instead, the trial court found that she went to Kentucky solely to give birth, not to relocate. Appellant thus temporarily absented herself from Ohio. By extension, B.M. also was temporarily absent from Ohio. Under R.C. 3127.01(B)(7), the time of appellant's and B.M.'s temporary absence from Ohio counts when determining which state the child lived in from birth. We therefore believe that Ohio was B.M.'s home state when ACCS commenced the child custody proceeding. Moreover, we observe that under R.C. 2151.06, a child is deemed to have the same residence or legal settlement as the child's parent(s). Because

the trial court possessed jurisdiction as B.M.'s home state, it had no need to consider whether any other provision, such as R.C. 3127.18, authorized it to exercise jurisdiction in the child custody proceeding.

{¶ 85} Additionally, even if the trial court did not have home-state jurisdiction because the child had spent the two days of his life in a Kentucky hospital and had yet to physically live in Ohio with appellant, the court possessed significant-connection jurisdiction. The significant-connection jurisdictional provision applies if a court in another state does not have home-state jurisdiction and (1) "[t]he child and the child's parents, or the child and at least one person acting as the parent, have a significant connection with [Ohio] other than mere physical presence; and (2) "[s]ubstantial evidence is available in [Ohio] concerning the child's care, protection, training, and personal relationships."

{¶ 86} In the case sub judice, no evidence in the record supports a conclusion that Kentucy is the home state. Appellant did not live in Kentucky. B.M. did not live in Kentucky. B.M.'s sole connection to Kentucky was appellant's decision to give birth in that state. As the trial court found, appellant traveled to Kentucky with the sole intent of giving birth. The evidence amply shows that both appellant and the child have a significant connection to Ohio. When ACCS filed the complaint, appellant resided in Ohio and her remaining three children lived in Ohio with a foster family. The vast majority of the evidence concerning B.M.'s care, protection, training, and personal relationships was available in Ohio. The only possible evidence concerning B.M. that occurred in Kentucky was the circumstance of his birth and his care in the two days following his birth. Thus, even if the trial court did not have home-state jurisdiction, we believe that it properly exercised significant-connection jurisdiction.

**{¶ 87}** Appellant nevertheless asserts that R.C. 3127.15 does not apply when the child custody proceeding involves temporary emergency custody. Appellant appears to argue that R.C. 3127.18 is the only statute that authorizes a court to exercise jurisdiction in a temporary emergency custody proceeding. We do not agree.

**{¶ 88}** Resolving appellant's argument that R.C. 3127.18 defined the trial court's subject-matter jurisdiction to award ACCS temporary emergency custody of the child requires us to interpret the UCCJEA statutes. The interpretation of a statute is a question of law that we review de novo. In re Adoption of B.M.W., 4th Dist. No. 10CA899, 2010-Ohio-5214, ¶13.

> "The primary goal of statutory construction is to ascertain and give effect to the legislature's intent in enacting the statute. The court must first look to the plain language of the statute itself to determine the legislative intent. We apply a statute as it is written when its meaning is unambiguous and definite. An unambiguous statute must be applied in a manner consistent with the plain meaning of the statutory language."

State v. Lowe, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶9 (citations omitted).

**{¶ 89}** R.C. 3127.15 begins by stating that "[e]xcept as otherwise provided in R.C. 3127.18," an Ohio court "has jurisdiction to make an initial determination in a child custody proceeding only if one" of the listed circumstances applies. R.C. 3127.01(B)(8) defines "[i]nitial determination" as "the first custody determination concerning a particular child."

**{¶ 90}** R.C. 3127.18 states:

> (A) A court of this state has temporary emergency jurisdiction if a child is present in this state and either of the following applies:
> (1) The child has been abandoned.
> (2) It is necessary in an emergency to protect the child because the child * * * is subjected to or threatened with mistreatment or abuse.

**{¶ 91}** A plain reading of R.C. 3127.15(A) shows that R.C. 3127.18 is an exception to

the four types of jurisdiction listed in R.C. 3127.15. <u>In re S.S.</u>, <u>supra</u>. This means that an Ohio court must have jurisdiction under R.C. 3127.15(A) to make an initial custody determination, but if it does not, then R.C. 3127.18 may empower it to exercise temporary emergency jurisdiction.

{¶ 92} R.C. Chapter 3127 does not define "temporary emergency jurisdiction" and nothing in R.C. 3127.15(A) suggests that an "initial determination" cannot include a determination made in a temporary emergency child custody proceeding. A temporary emergency child custody determination may in fact be "the first custody determination concerning a particular child." R.C. 3127.18(B)(8). Notably, R.C. 3127.18 does not state that a trial court has temporary emergency jurisdiction to issue a temporary emergency custody <u>determination</u> only in the specified circumstances. R.C. 3127.18(A) concerns when a court may exercise jurisdiction outside the four situations listed in R.C. 3127.15(A). R.C. 3127.18(A) thus speaks to the type of jurisdiction a court may exercise, not to the type of custody determination it may issue. R.C. 3127.18(A) does not define when a court may make an "initial determination" and does not purport to limit a court's authority to make an "initial determination" that involves a temporary emergency child custody determination to only those situations falling within R.C. 3127.18(A). Instead, R.C. 3127.18(A) concerns temporary emergency jurisdiction–that is, the statute defines when a court may exercise jurisdiction outside the confines of R.C. 3127.15(A).

{¶ 93} To read R.C. 3127.18 as appellant suggests would frustrate the purpose of the UCCJEA–to avoid jurisdictional conflicts and to afford the home-state jurisdictional priority. <u>Rosen</u>, <u>supra</u>. Moreover, interpreting the statute as appellant suggests means that no state could ever issue any type of temporary emergency custody order unless the child was physically present in that state. R.C. 3127.18 is not directed towards every situation that calls for a temporary

emergency custody order.   Instead, the statute is intended to provide a state with temporary and emergency jurisdiction over a child who demands immediate protection due to abandonment, mistreatment, or abuse.   The statute has no applicability unless the child is abandoned or subjected to or threatened with mistreatment or abuse.   See United States Department of Justice, Office of Juvenile Justice and Delinquency Prevention, The Uniform Child-Custody and Enforcement Act, December 2001, 6 (stating that the "UCCJEA narrows the * * * definition of 'emergency' by excluding neglect cases * * *").

{¶ 94}  Thus, R.C. 3127.18 is an exception to R.C. 3127.15 and provides an additional basis under which a court may exercise jurisdiction.   R.C. 3127.18 is not the exclusive means by which a court may exercise jurisdiction in a temporary emergency custody proceeding.   Rather, the purpose of the statute is to provide a court that otherwise lacks jurisdiction under R.C. 3127.15 with jurisdiction if a temporary emergency situation presents itself.   Contrary to appellant's argument, R.C. 3127.18 does not apply every time a complaint is filed that seeks temporary emergency custody.   Consequently, we disagree with appellant that the trial court erroneously exercised jurisdiction over ACCS's complaint that requested temporary emergency custody of B.M.

{¶ 95}  Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

[Cite as *In re R.M.*, 2013-Ohio-3588.]
Harsha, J., concurring:

{¶ 96} I concur in judgment and opinion except that I limit my finding in the second assignment of error on the trial court's jurisdiction over B.M. to be that of "significant – connection" jurisdiction under R.C. 3127.15(A)(2).

[Cite as *In re R.M.*, 2013-Ohio-3588.]

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, J.: Concurs in Judgment & Opinion

Harsha, J.: Concurs with Concurring Opinion

For the Court

BY:_____

Peter B. Abele, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.