[Cite as *In re W.V.*, 2024-Ohio-4446.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | | |
|---|---|---|---|
| In the Matter of: | : | Case No. | 24CA1199 |
| W.V. | : | DECISION AND | |
| T.V. | | JUDGMENT ENTRY | |
| N.V. | : | | |
| M.V. | | | |
| | : | **RELEASED 9/3/2024** | |
| Adjudicated Dependent Children. | | | |

_____
APPEARANCES:

Brian T. Goldberg, Cincinnati, Ohio, for appellant.

Aaron Haslam, Adams County Prosecutor, and Ariana Bowles Norris, Adams County
Assistant Prosecutor, West Union, Ohio, for appellee.
_____
Hess, J.

{¶1} The mother of W.V., T.V., N.V., and M.V. appeals a judgment of the Adams County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to Adams County Children Services (the "Agency"). Mother asserts one assignment of error contending that the permanent custody award is not in the best interest of the children. For the reasons which follow, we overrule the assignment of error and affirm the juvenile court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶2} On November 9, 2022, the Agency filed complaints alleging that the children appeared to be dependent children and requested it be granted protective supervision. The Agency filed an amended complaint on November 21, 2022 in which it alleged that in September 2022, it received a report from law enforcement about a domestic dispute

at the residence.  The complaint alleged the children's father was charged with domestic violence against the mother and one of the children. In October 2022, the no contact order involving the mother was dropped but the no contact order for the child remained.   The Agency alleged that it had filed the November 9, 2022 complaint for protective supervision to ensure that the children were safe and the father was not in the home. The complaint also alleged that the children had previously been removed from the home in 2013 by Williams County Children Services for drug use and drug paraphernalia. The children's paternal aunt had been granted custody of the children in 2014, but information had been received that the aunt's home was unsanitary, and the aunt had been using drugs. The children were returned to the parents even though the aunt still had legal custody. The Agency sought temporary custody of the children to ensure they were living in a safe environment because the father was convicted of domestic violence on November 10, 2022.

{¶3}    The juvenile court awarded temporary custody to the Agency on November 21, 2022. On January 4, 2023, the court held an adjudication hearing and found the children were dependent and they continued in the temporary custody of the Agency.  A case plan was established for the children in which both parents were to engage in drug diagnostic services, parent education services, mental health services, and marriage counseling. Additionally, father was to engage in counseling for domestic violence. The family and the children were to engage in counseling services. In March 2023, the children's maternal aunt and uncle filed a motion for legal custody of the children and in May 2023 they filed a motion for interim temporary custody. Also in May 2023, the guardian ad litem filed a report in which she recommended that temporary custody be

granted to the maternal aunt and uncle. However, in July 2023 the maternal aunt and uncle voluntarily dismissed their motion for legal custody. On November 15, 2023, the Agency filed a motion requesting permanent custody. The guardian ad litem filed an updated report in December 2023 in which she recommended that permanent custody be granted to the Agency because the parents had failed to complete the case plan, specifically they failed to submit to drug screenings.

## A.  Permanent Custody Hearing

{¶4}   On February 27, 2024, the juvenile court conducted the permanent custody hearing. The guardian ad litem filed a final report on that date in which she recommended that permanent custody be granted to the Agency because the parents did not complete the case plan objectives, "mainly random toxicology," and the parents "have not been visiting the children consistently" and "there have been recent positive drug screens."

{¶5}   The Agency called three witnesses.  Bonnie Cooper, an employee of the Agency testified that she served as the caseworker for the children. Cooper testified that two of the children were in children's homes and two were in kinship placements. N.V. was receiving counseling services and is very intelligent and capable of making straight A's in school.  M.V. is similarly intelligent and is active in sports. The two younger children, W.V. and T.V., are doing well, have good grades, and have bonded in their placement. Cooper testified that the family case plan requires the mother to attend parenting classes, mental health counseling, and drug and alcohol counseling. Cooper testified that the parents both completed their parenting classes. However, the mental health counseling had not been completed and Mother only completed four out of ten appointments. There was no evidence that either parent completed their domestic violence counseling. The

mother tested positive for methamphetamines and amphetamines in March and April 2023 and positive for marijuana in February 2024. The father tested positive for methamphetamine two weeks prior to the permanent custody hearing. However, multiple drug screens were not completed because the parents could not be located, they cancelled, or they were a no-show. Each parent completed only 1 random drug screen during the entire 15 months the case has been pending. Cooper testified that Mother and father only attended 8 of a possible 19 visitation sessions with their children. Cooper testified that a legally secure placement for the children is needed and can only be achieved by granting the Agency permanent custody and this would be in the children's best interest.

{¶6}    Father testified that he and Mother own their own home, mortgage-free, and have been actively fixing it up by painting various kids' rooms and refinishing the floors. He testified that he does not have a source of income but has filed for disability for back issues. He has a driver's license and a car, but transportation has been an issue because the roads "down here are a lot worse than the ones that are up north." He admitted that he had not taken the anger management class that was required of him and that he failed to complete the mental health counseling appointments because the health department cancelled on him multiple times. He testified that he had been diagnosed with PTSD and was on medication for it. Father testified that he does not see a mental health counselor. He admitted that he failed his initial drug screening test by testing positive for marijuana but that he had an expired medical marijuana card for his back issues. He then admitted that he tested positive two weeks prior to the hearing for methamphetamine and

marijuana. He admitted he smoked marijuana for his back issues but did not know how he tested positive for methamphetamine.

{¶7}     Father testified that his last visit with his sons was December 27, 2023. He explained that he has not visited them since that time because "I was denied because of the dirty test and any other one that we've missed before that was because we absolutely didn't have a ride." Father admitted he did not visit the children in January 2024 but explained that he had been very sick for two weeks and then had run out of gas on the way to one of the visitation appointments. Father admitted he had not visited his sons the entire month of February 2024 and explained that one missed appointment was due to a death in the family – his wife's grandmother had died. Father has a no contact order that prevents him from visiting his daughter. He admitted that he has had a "fair share" of problems with his wife but testified that the domestic violence case against him was for "verbal" domestic violence. Father testified that other than failing to complete anger management classes, he believes he has been compliant with the case plan. His desire is for all his children to be returned home to him. Father testified that if he had more time to work on his plan, he would get his anger management classes done, would make himself available for drug screens, and would attend every one of his visitation sessions with his children.

{¶8}     Mother testified that she has had several positive screens for marijuana and that she does not have a medical marijuana card. However, she testified that the Agency was going to treat marijuana usage like alcohol and as long as she was not using when she showed up for visitations, she would still be able to see her children. Mother testified that she last saw her children two weeks prior to the hearing and that she talks

to them almost every day on the phone. Mother admitted "I have missed quite a bit of visits" but she explained that the Agency's phone does not work and she could not contact them and sometimes she does not have a ride. Mother described her relationship with M.V. as "close" and "I know a lot about him."  Mother described her relationship with N.V. as "close" but "she went a little stray on me . . . she's going through so much." Mother also testified that N.V. has been "saying things like cussing and stuff." Mother testified that she has a close relationship with T.V. and W.V. Mother testified that the children did well in school and the primary problems were occasional C's and D's, smoking, and cussing.

{¶9}   Mother testified that her relationship with father has improved since he began taking medication. Mother believed that most of their disputes involved how to punish the children, "it's the parenting and, you know, other things like that. Drugs were more of the issues." For her income, Mother testified that she receives $420 from a state program and earns additional income from a babysitting job. Mother testified that she believes it is in the best interest of the children to come home because she believes she has raised them well and "we're a loving family. I want a family. I love the kids. They love us. I will agree there's things that I've done wrong, and I've seen that, and I fixed them. Um, I just believe, you know, I'm a good mom."

{¶10} Mother testified that it concerned her that her husband tested positive for methamphetamine two weeks prior to the hearing. She admitted that she failed as well "during this process." Mother described the domestic violence incident that commenced the case as a verbal altercation about whether N.V., who was grounded, would be allowed to go to the movies. When asked about the police report stating that father "physically

attacked you," Mother testified that, "he did stop me when I went into the road, and he grabbed hold of my daughter, too. He did stop me in the road, but it was mainly me just saying, get off of me. And he just wanted to talk to me. There like, I had no, like, he didn't beat on me or anything like that." When asked, "So at no point did he pull your hair and hit you in the left side of the face with a closed fist?" Mother testified, "No, he didn't" and that the police report lied and was incorrect. Mother testified that the police were called by her children who were upset by what they were witnessing in the yard. Mother testified that when she and father were in "our using days" they would get into physical altercations:

> Um, well, when we were in our, using our using days, you know, he, it, it was like he'd pushed me over or, you know, stuff like that. Um, never, I've never been punched by this man. Um, pushed around, maybe? Yes. Never threat. Like I've never been personally scared of him. I'm not scared of him. Um, but yes, it has, it has gone there. But that, that day, like I said, he was holding me, and we were wrestling around. He did grab hold of my daughter by the back and she called the cops. He was scared, and so forth.

{¶11} Mother testified that she had been to prison for drug manufacturing but denied that she had also been charged with felony child endangerment. Mother did not have a driver's license because it was suspended in 2020. The court asked Mother if it was "failure to control and hit skip, leaving the scene in 2020." Mother responded, "You know, it was probably quite a bit, sir. I was in quite a bit of trouble then." Mother conceded that she was not surprised that the children felt safer at home when father was not present, but explained, "like I said, uh, it, it was his tone in the words that were our main thing." Mother denied that either her or father were using methamphetamines during the domestic dispute in 2022 which caused the case to commence.

{¶12} The guardian ad litem informed the court that she turned in a report and agrees with the caseworker that the Agency should be granted permanent custody of the children. The main issues she saw with the case were the domestic violence problems and ongoing drug usage.

### B.  Permanent Custody Decision

{¶13} In March 2024, the juvenile court magistrate issued a decision granting the Agency permanent custody finding that the children had been in the Agency's temporary custody for 12 or more months of a 22-month period and it was in the children's best interest to be in the Agency's custody. Mother filed objections to the magistrate's decision in which she argued that the magistrate erred when it found that the children could not and should not be placed with either parent within a reasonable time. She also argued that it was not in the children's best interest to be placed in the Agency's permanent custody and that the Agency did not use diligent efforts to assist the parents to remedy the problems. The juvenile court overruled her objections and adopted the magistrate's decision granting the Agency permanent custody of the children. The juvenile court found that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. The court stated that "[a]s of the date of the final hearing, Mother had not yet resolved the behaviors and issues that resulted in agency involvement, and by her own statements needs more time. She is still residing with Father and as she points out . . . he is not as far along in his case plan as she is." The court also stated that it conducted in camera interviews of the children with the guardian ad litem and their attorney and the decision to grant the Agency permanent custody was made in consideration of its interviews. It analyzed the best interest factors under R.C.

2151.414(D)(1)(a)-(e). The juvenile court found that the parents have a history of domestic violence but still reside together, the children have been exposed to the domestic violence, and it has had different effects on each of the children. The court also noted that this was not the family's first involvement with children protective services and noted that in 2014 a paternal aunt was granted custody of the children due to substance abuse issues with the parents. The court found that the guardian ad litem recommended that the Agency receive permanent custody.

{¶14} The court made findings in addressing the children's need for legally secure permanent placement and found:

> [O]ut of 17 appointments for Mother with the Health Department she only completed 3 appointments and she no-showed 7 times. . . . Neither parent complied with the case plan objective regarding the Health Department. . . . Mother has not had contact with the children since 11/15/2023.

> Mother was only present for 4 out of 12 of the agency home visits, and her last visit had been on October 13, 2023. Mother last called the agency on January 24, 2024 and the worker reported that although she returned mother's call, she was unable to leave a message. Despite a recommendation in February of 2022 of no continued treatment, she tested positive for Benzodiazepine, methamphetamine, and amphetamines on April 19, 2023 and for methamphetamine and amphetamine on March 22, 2023. . . . A review of State's Exhibit 2 establishes a record of failure to comply with the case planned services.

> Out of a total number of 19 visits with the children, the parents only attended 8. The missed visits were primarily cancelled by the parents or failing drug screens. There was also no evidence submitted as to the ability of either parent to maintain employment.

The court found it was in the best interest of the children to grant the Agency permanent custody.

## II.  ASSIGNMENT OF ERROR

{¶15} Mother presents one assignment of error: "The trial court erred in terminating [mother's] legal custody of her four children."

## III.  LAW AND ANALYSIS

### A.  Standard of Review

{¶16} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence."  *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.).  We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."  [*In re T.J.*, 2016-Ohio-163, ¶ 25 (4th Dist.)], citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20.  In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.  *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).
>
> In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence."  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1).  "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14.  "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence."  *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.)  *Id.* at ¶ 21-22.

B. Statutory Framework

{¶17} Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child. In this case, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., the children had "been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *." Mother does not dispute that the children were in the temporary custody of the Agency for the requisite time; therefore, we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

{¶18} R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

C.  Best Interests of the Children

**{¶19}**  Mother contends that the juvenile court erred in granting permanent custody to the Agency because it failed to consider the positive steps Mother had taken to regain her children. She argues that she completed parenting classes and a drug and alcohol assessment and, other than a few positive tests for marijuana, she "appeared to be staying drug free." She also argues that she had a vehicle and was working on getting a valid license. She argues that placement of the children in the permanent custody of the Agency was not in their best interest because the children will not be able to reside together outside of the home, they were well connected to Mother, and at least two of the four children wanted to return home to live with Mother.

1. Mother's Progress on Case Plan

**{¶20}**  While Mother has made some progress toward the completion of some portions of her case plan, there were still portions which she had not completed. Moreover, the primary goal is not simply to complete the plan, but to remedy the problems that lead to agency involvement in the first instance.

> Even the successful completion of a case plan is not dispositive on the issue of reunification. Where a parent has participated in his or her case plan and completed most or all of the plan requirements, a trial court may still properly determine that such parent has not substantially remedied the problems leading to agency involvement.

*Matter of N.D.,* 2023-Ohio-439, ¶ 26 (5th Dist.); *Matter of E.R.*, 2023-Ohio-1468, ¶ 45 (4th Dist) ("a parent's case plan compliance may be a relevant, but not necessarily conclusive, factor when a court considers a permanent custody motion").

**{¶21}**  Here the juvenile court properly recognized some efforts by the mother to comply with the case plan but also properly recognized that it is "not obligated to hold the

child in custodial limbo while a parent works on or promises to work on the objectives of the case plan after the child has been in the custody of the Agency for over 462 days. A parent's hope to be able to adequately provide for and care for the child is speculative and unproven." Additionally, the juvenile court stated that the "most relevant" point is that the "goal of a case plan is to resolve and address the behaviors and/or issues that resulted in the agency involvement. . . . As of the date of the final hearing, Mother had not yet resolved the behaviors and issues that resulted in agency involvement, and by her own statements needs more time."

### 2. Interactions and Interrelationships of the Children

**{¶22}** There is evidence to support the juvenile court's finding that the children have inappropriate interrelationships and interactions with their parents. Specifically, the court found, "There is a history of Domestic Violence between Mother and Father and the parties still reside together. The children have each been exposed to this and it has had differing effects on each of the children." An Agency caseworker testified that two of the children were housed in "the children's home and the two younger ones are in kinship placement" and that both of the children in the home were doing well in their placement and that one of the children was receiving counseling and medication for mental health issues. The other two younger children are bonded in their kinship placement, are doing well academically, and are staying out of trouble.

### 3. Wishes of the Children

**{¶23}** R.C. 2151.414(D)(1)(b) requires consideration of "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." The juvenile court stated that in considering the wishes of

the children it had conducted in-camera interviews with each of the children. Additionally, the guardian ad litem's final report stated that the two younger children are well bonded to their placement and "are unsure at times whether they want to remain there or be back with Mother and Father." The guardian ad litem believed the younger children could be influenced by feelings of manipulation. As to the two children who were in the children's home, the guardian ad litem reported that they "are at the Children's Home so there is no 'placement' to be bonded with" and want to be home with their parents.  In the permanent custody decision, the court explicitly referenced the guardian ad litem's report and that she had recommended permanent custody to the Agency.

### 4.  Custodial History

**{¶24}**  The juvenile court found that the children had been in the temporary custody of the Agency for 12 months and 5 days and that none of the children had been in the legal custody of either parent since 2014 due to legal custody being granted to a paternal aunt in the Williams County case. The Agency caseworker testified that children were in the Agency's temporary custody continuously since November 2022.

### 5.  Legally Secure Permanent Placement

**{¶25}**  The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.).  "A legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

{¶26} Evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. The guardian ad litem expressed concerns that the parents had not been visiting with the children and had recent positive drug screens. Additionally, the juvenile court noted that out of 17 mental health counseling appointments, the mother completed only 3 appointments. Mother was also only present for 4 out of 12 agency home visits and her last visit had been in October 2023. Both parents had repeatedly tested positive for methamphetamine and other drugs.

{¶27}   Although in her objections to the magistrate's report, Mother urged the court to give her more time "to continue to make efforts toward completing her case plan to ultimately be reintegrated into the life of her children," case law hold that "the permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 2019-Ohio-2564, ¶ 34 (4th Dist.). "[K]eeping children in limbo is not in their best interests." *Id.*

6.  Factors in R.C. 2151.414(E)(7) to (E)(11)

{¶28} The juvenile court did not find R.C. 2151.414(E)(7) to (E)(11) applied. Nothing in the parties' briefs or record indicates they are applicable to this case.

IV.  CONCLUSION

{¶29} The juvenile court's best interest finding is not against the manifest weight of the evidence.  The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children.  Accordingly, we conclude that the

permanent custody award is not against the manifest weight of the evidence, overrule the

sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
      Michael D. Hess, Judge




## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**